**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Tim Z. OGLE, Defendant-Appellant.**

**No. 78–1625.**

United States Court of Appeals, Tenth Circuit.

Nov. 1, 1979.

Rehearing Denied March 5, 1980.

Richard N. Stuckey, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., and James E. Nesland, Asst. U. S. Atty., Denver, Colo., of counsel, on the brief), for plaintiff-appellee.

Irvin M. Kent, Denver, Colo. (Arthur R. Karstaedt, III, Denver, Colo., on the brief), for defendant-appellant.

* Of the Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

1. The indictment alleged that:

 On or about February 21, 1978, in the State and District of Colorado, defendant, TIM Z. OGLE, aided and abetted by Jacquelyn C. Lagoni, not named herein as a defendant, willfully, knowingly and corruptly endeavored to influence, obstruct and impede the due administration of justice in the case of *United States of America v. Norman A. Gi-*

Before HOLLOWAY and DOYLE, Circuit Judges, and BOHANON,* Senior District Judge.

**WILLIAM E. DOYLE, Circuit Judge.**

The defendant-appellant seeks reversal of a judgment of conviction which was entered on June 15, 1978, in the United States District Court for the District of Colorado. The indictment described a violation of Title 18 U.S.C. § 1503.[1] Thus, the defendant was accused of knowingly and corruptly endeavoring to influence, impede and obstruct the due administration of justice in a case then pending in the United States District Court. A further specific allegation identified Colleen Hansen as a juror in a case then being tried and stated that he endeavored to deliver to her a pamphlet called "A Handbook for Jurors."

There are two fundamental questions which go to the crux of the case. First, whether, in fact, the defendant, Ogle, had endeavored to communicate with the juror, Colleen Hansen. This question, being one of fact, was resolved by the jury, and the only appellate issue is whether the evidence is sufficient to justify its submission to the jury. The second question is whether he endeavored to deliver to Mrs. Hansen the pamphlet entitled "A Handbook for Jurors." The government's theory is that he had endeavored to do this through an agent, Jacquelyn Lagoni. The question of law which threads through the entire case and which is raised in various ways by the appellant is whether a belief by the defendant, subjective in nature, as to the validity of a law, constitutes a justification for his taking action which would effectively nullify it.

*gax,* Criminal Case No. 78–CR–3, which was then pending before the United States District Court for the District of Colorado, in that TIM Z. OGLE did endeavor to communicate and caused to be communicated with Colleen Hansen, a petit juror in said case, and did endeavor to deliver to said petit juror a pamphlet entitled Handbook for Jurists, all in violation of Title 18, United States Code, Section 1503.

At the times in question, Ogle was a pilot for Continental Airlines. Two of the witnesses in this case, Colleen Hansen, the juror, and Jacquelyn Lagoni, the important witness, were stewardesses for Continental Airlines and were well acquainted with Ogle. Jacquelyn Lagoni had made flights on planes which Ogle had been piloting. Also, she and her husband, William Lagoni, had attended a several weeks' course which was conducted by Ogle. This course was variously described as being one in good citizenship which centered around the Constitution, the Bill of Rights and our system of government. The textbook used in this course had been written by the defendant Ogle and was entitled "Good Citizenship with Constitutional Tax Return and Procedures," Exhibit 2. There was also a pamphlet which was a small version of the mentioned book. It was entitled "A Handbook for Jurors," Exhibit 1.

The tax return book advised that the jury was more powerful than all three branches of the government combined, and that after jurors are armed with the Constitution and are aware of their power, they have the final authority to acquit one of their fellow citizens accused of a crime that the jurors do not consider to be a crime based on their consideration or determination of the justice of the law. This is described as the jury's right of nullification. The book goes on to say that this is a protection against unjust laws and that the verdict of the jury cannot be challenged or retried or overturned by any higher court. It further says that a juror has more power than the President of the United States, the United States Congress, and the United States Supreme Court.

Much of the book's space is addressed to tax matters. It tells the reader how to make out the income tax return with a view toward convincing a potential jury of their good faith in obeying the law. Use of attachments such as Honorable Discharge from the service, evidence of civic service, letters to Congress and clippings from newspapers is advocated. It sets forth an income tax return which is filled out in blank with asterisks. It seeks to establish that the Sixteenth Amendment validating the federal income tax is subject to being itself declared unconstitutional. Included is an affidavit of insufficient income which reads: I swear, under penalty of perjury, that the income I received in 19____ was less than $750 *statutory dollars,* as I understand that term. Signed _____." (Emphasis supplied.)

The pamphlet, "A Handbook for Jurors," teaches that tax crimes are not true crimes and that it is unnecessary for jurors to follow the law of the land where they conceive of the law being contrary to their concepts of morals. The book also teaches that a juror is empowered to determine if a law under which a person is charged is contrary to the Constitution or common law and acquittal is appropriate. The emphasis in the handbook is that the juror is empowered to acquit where he feels that the law is unfair or that it infringes on fundamental rights.

The trouble started when Colleen Hansen, a stewardess for Continental Airlines, was empaneled as a juror in a case against one Norman Gigax, who had been involved in the tax protest movement and was on trial for filing a false W–4 employee withholding form. Ogle, as we have previously mentioned, also had an intense interest in this tax protest movement in that he conducted the school and wrote the literature which was used in the classes. He was present at the trial of Gigax and recognized Mrs. Hansen, who was a stewardess for Continental Airlines. Also, on the first day that he was at the trial, he had some brief communication with Mrs. Hansen in the elevator. That same evening, Ogle contacted Jacquelyn Lagoni by telephone. She was not only a stewardess for Continental Airlines, she was also a student of Ogle's in the tax course and was a personal acquaintance of Mrs. Hansen's. This telephone communication was made by Ogle from the auditorium where he had been a spectator at some tennis matches which were being played there.

The conversation between Ogle and Mrs. Lagoni, according to the latter, pertained to whether or not Mrs. Hansen had a copy of the booklet entitled "A Handbook for Jurors," which discussed and advocated the concept of jury nullification. Shortly after this conversation, Lagoni called Mrs. Hansen and revealed that she knew that Mrs. Hansen was a juror on the *Gigax* case, and that Mrs. Lagoni told Mrs. Hansen, as a result of inquiry by the latter, that Ogle had been the source of her information. Mention was made of the pamphlet "A Handbook for Jurors," and Mrs. Hansen was asked if she would like to have a copy. Moreover, Mrs. Lagoni offered either to have Ogle deliver a copy or to deliver a copy herself. Mrs. Hansen refused the offer and reported the incident to the judge.

Immunity was offered to Mr. and Mrs. Lagoni in return for their cooperation at trial. They accepted this, but informed the judge that they intended to invoke their Fifth Amendment privilege against self-incrimination if they were asked any questions about their personal return. It was on this basis that they were called as witnesses.

The theory of the prosecution's case was that Ogle's telephone call to Mrs. Lagoni was part of an attempt to communicate to her his desire that the pamphlet mentioned above, "A Handbook for Jurors," should be delivered to Mrs. Hansen. The government also contended that this was an effort by Ogle to manipulate Mrs. Hansen's actions as a juror.

Ogle enumerates a number of errors as a basis for reversing the judgment of the trial court:

1. He contends that the trial court erred in refusing to allow him to testify that he had no intention of influencing a juror, which refusal of the trial court would leave the jury with the impression that intent was unimportant to a decision in the case. An objection to questions asked on redirect examination concerning Ogle's intent to influence the jury was sustained. The government's response is that Ogle did testify regarding his lack of intent on direct examination and there was no need for him to repeat it on redirect. The argument is that the objection on redirect was valid because the evidence was repetitive. Ogle's position is that the issue of intent was explored on cross-examination and that he had a right to again assert on redirect that he had no such intent so as to prevent confusion.

2. Ogle criticizes an instruction of the court defining "corruption" as used in the statute. The court told the jury that "corruptly" means any endeavor to influence a juror in the performance of his or her duties or to influence, obstruct or impede the due administration of justice. He argues that reference to evil or wicked purpose should have been included in the definition and that its absence effectively eliminated the corrupt element of the crime. He maintains that the word "corrupt" means something that is especially diabolic, above and outside the letter and spirit of the law.

The government's argument in response to this is that the instructions considered as a whole clearly bring home to the jury the fact that specific intent requiring a bad motive is an element of the crime. A Tenth Circuit case is cited to prove the propriety of the definition of "corrupt" which was given by the judge. This was *Broadbent v. United States*, 149 F.2d 580 (10th Cir. 1945).

3. The next point is that the trial court committed error in refusing to allow Ogle to testify as to the materials he studied and relied upon in arriving at his convictions which were set forth in "A Handbook for Jurors." His position was that such testimony would have aided him in showing the jury that he did not have a corrupt motive; that it was in good faith, undoubtedly.

The government responds that the testimony is irrelevant and that Ogle's defense was that the phone call to Lagoni was not intended to get her to make any further communication to the juror, not that such communication was made in good faith and therefore not corrupt. They also argue that even if such a defense had been made, it would have been to no avail because the genuineness of Ogle's belief and his ideas in the book do not constitute a legal defense to the charge.

4. Ogle maintains that it was error for an instruction concerning the effect of the First Amendment to omit the word "corruptly" from the description of the activity forbidden. The instruction was not objected to at the trial. It is also claimed that there was error in the instruction given concerning the proof of specific intent. Again, no objection was made at trial.

5. Ogle requests a new trial based upon the alleged misconduct of the prosecutor in asking Mrs. Lagoni whether she changed her W–4 form. She claimed the Fifth Amendment privilege. The claim is that this was a deliberate effort to discredit Lagoni in an impermissible way, and that the government knew very well that she was going to invoke the Fifth Amendment privilege if some mention was made in her questioning as to her own personal return.

The government's answer is that the Fifth Amendment was not properly invoked in this instance and therefore the prosecutor was not at fault. The government calls attention to the fact that a mistrial was not requested when the incident occurred at trial.

6. Ogle further maintains that he is entitled to a reversal based on lack of effective assistance of counsel. He points to failures to make objections and form an adequate record for appeal by the trial attorney. An issue was raised as to what standard is to be applied to determine when counsel is incompetent. Note: There is no evidence whatever that there was incompetent counsel. The representation was found by Judge Arraj to have been highly adequate, and from our view of the record we agree with this appraisal.

7. Ogle raises an issue as to whether the trial court committed error in refusing to conduct an evidentiary hearing into alleged jury misconduct. The claim is supported by affidavits of persons who had been in the courtroom during trial.

A government agent seated at the prosecution table is alleged to have been contacted by the juror.[2]

I.

## THE INSTRUCTION DEFINING THE WORD "CORRUPTLY"

We first consider the argument that the trial court misinterpreted and misapplied 18 U.S.C. § 1503 and in doing so effectively eliminated the word "corruptly" from the statute.

The trial court concluded and instructed the jury that "corruptly" was used in the present context as being an " * * * endeavor to influence a juror in the performance of his or her duties, or to influence, obstruct or impede the due administration of justice." It is contended that this was a fundamental error and that it should have included reference to an evil motive, something bad, wicked, or having an evil purpose.

■ Volume I of Bouvier's Law Dictionary defines the term "corruption" as follows: "An act done with an intent to give some advantage inconsistent with official duty and the rights of others." The author continues: "It includes bribery but is more comprehensive; because an act may be corruptly done though the advantage to be derived from it be not offered by another. Something against law; as a contract by which the borrower agreed to pay the lender his interest. It is said, in such case, that it was corruptly agreed, etc." This, then, is the common definition. It really means unlawful, and this is the way that Judge Arraj interpreted it and put it in terms of the facts of this case. In other words, he said that an endeavor to influence a juror in the performance of his or her duty or to influence, obstruct or impede the due administration of justice is per se unlawful and is tantamount to doing the act corruptly. We approve fully the trial court's interpretation.

The basic fact issue in this case is whether the defendant obtained the services of Mrs. Lagoni as an agent to contact the juror, Mrs. Hansen, and endeavored to have a copy of the pamphlet "A Handbook for Jurors" delivered to her. The government

---

2. We find that the judge did not err in his handling of this matter. Based upon affidavits, the judge determined that there was not actual-ly any contact. An effort was made to make a mountain out of a molehill. We find nothing to even discuss.

maintains that this was actually done and that this and other corroborative acts of the defendant show that he intended to influence the conduct of the juror, Mrs. Hansen. Defendant, on the other hand, had a theory of his own. He claims he was merely calling Mrs. Lagoni for the purpose of discussing other matters and that he did not really seek to contact Mrs. Hansen. This, of course, is a conflict in the evidence which has to be resolved by the jury.

■ But the defendant has still another theory, a legal one, which is found in his contention that in order to have a condition in which there is a corrupt effort to influence a jury that force or threats have to be used; that a mere attempt would not be sufficient. We disagree. In the present context it is a question whether he actually endeavored to influence or impede justice.

On the meaning of the term "corruptly," this circuit has spoken in *Broadbent v. United States, supra.* This 1945 decision of this court was handed down in relationship to a charge of corruptly endeavoring to influence a witness. The question was whether the evidence was sufficient. The defendant had made promises to the witness of financial security and had made threats of character defamation. The court said that the evidence in support of this charge, endeavoring to influence a witness or to impede and obstruct justice, falls within the connotation of the word "corruptly." The court said that the statute was designed to protect witnesses in federal courts and to prevent a miscarriage of justice by corrupt methods. The court acknowledged that "corruptly" was subject to other meanings, but that in the present context, one similar to that which we have at bar, included, according to the opinion, "any endeavor to influence a witness or to impede and obstruct justice."

■ Thus, the view that this court has taken and which most of the other courts have taken is that the term "corruptly" does not superimpose a special and additional element on the offense such as a desire to undermine the moral character of a juror. Rather, it is directed to the effort to bring about a particular result such as affecting the verdict of a jury or the testimony of a witness as in *Broadbent.* This is *per se* an obstruction of justice and was so recognized in *Broadbent* and by the trial court in this case. The trial court's legal view of this was correct.

■ Counsel for appellant argues that both *Bosselman v. United States,* 239 F. 82 (2d Cir. 1917), and *United States v. Polakoff,* 121 F.2d 333 (2d Cir. 1941), involved inherently evil motives. No doubt. But if the jury believed the evidence in this case, the motives were inherently evil and it was not necessary to tell the jury that they were evil. All that they had to find was that there was a corrupt endeavor which was an effort to wrongly influence the injury.

■ The defendant also argues that the evidence is legally inadequate to establish that the defendant acted corruptly. However, if the jury believed the testimony of Mrs. Lagoni and that of Mrs. Hansen with respect to their conversations with the defendant and with one another, the evidence cannot be said to be insufficient. The defendant went into court and was given permission by the judge to take notes, and according to Mrs. Hansen he caught her eye. This, in addition to the testimony of Mrs. Lagoni, which has been detailed above, supports the conclusion that he sought to influence her decision in the case, particularly if the jury believed that he was seeking to get a copy of the pamphlet "A Handbook for Jurors" into her hands. The inference could flow from all of this that there existed an intent on the part of Ogle to willfully and corruptly obstruct and impede the due administration of justice. The jury was, of course, at liberty to accept the testimony given by Mrs. Lagoni and Mrs. Hansen and to reject that of the defendant that he was merely calling in order to rearrange a dinner engagement.

II.

REFUSAL OF THE COURT TO ALLOW THE DEFENDANT TO REPEAT THAT HE DID NOT INTEND TO INFLUENCE A JUROR

On the question of his intent, the defendant was asked whether he had ever advo-

cated handing this pamphlet out to individuals on jury duty. He said that he had. He was then asked whether he believed the purpose of the pamphlet was to influence a jury in any way as to how they should vote in a particular case, to which he answered "No, I do not believe that that is the purpose of the book at all." He was asked whether he had advocated that the pamphlet be handed out to jurors, and he said that he did not recommend it at the present time because of the confusion, and added that "I have withdrawn my recommendation that it be handed to jurors." The defendant stated his understanding of the pamphlet as shown below.[3]

He then proceeded to discuss his idea of jury nullification as explained in the pamphlet, his theory being that a juror is not required to follow the law if he disagrees with it, and that jurors are free to resort to some higher sense of morality. He was also asked whether in talking to Mrs. Lagoni he did not attempt to contact Colleen Hansen, who was then a juror in the *Gigax* case, for the purpose of influencing her decision in that trial. He also said that he did not call Jacquelyn Lagoni for the purpose of having her see if she could influence the juror, Colleen Hansen. He conceded on redirect examination that he had asked Mrs. Lagoni whether she knew Colleen Hansen.

The defendant was asked by his counsel (on redirect examination) whether on the night of February 21, he took any action designed to influence Colleen Hansen with respect to the *Gigax* case. Objection was made by the United States Attorney, and the court sustained the objection. Counsel for the defendant then asked whether when he called Jacquelyn Lagoni on the night of February 21, 1978, he did so with the intent of influencing Colleen Hansen in the exercise of her duty. This was objected to by the United States Attorney, and the court sustained it. He then testified that he had called Lagoni for two reasons, first, to discuss the dinner plans, and, second, to satisfy his curiosity whether or not Colleen had seen his little handbook. Defendant was allowed to discuss at some length one of his other books, "Good Citizenship with Constitutional Tax Return and Procedures," government's Exhibit 2, which he explained was an alternative to filing a regular tax return.

■ We have detailed the testimony of the defendant in an effort to ascertain whether he suffered prejudice as a result of the trial court's ruling which sustained objections as to his testifying regarding his intent. Our conclusion is that he was allowed to testify extensively as to what his motive and his intent were, and he was allowed to say that he did not seek to influence the juror, Mrs. Hansen. In view of the broad presentation that was made by him and on his behalf, we fail to see prejudice as a result of the sustaining of objections to questions which called for answers which summarized the evidence and reiterated his lack of intent to influence the juror. Since this was his entire theme, the court acted within its discretion in sustaining the objections to the two repetitive questions in controversy.

### III.

### THE CONTENTION THAT THE COURT ERRED IN SUSTAINING OBJECTIONS OF THE U.S. ATTORNEY TO QUESTIONS WHICH WOULD HAVE ALLOWED THE DEFENDANT TO EXPLAIN THE RESEARCH AND STUDY WHICH FORMED THE BASIS FOR HIS BELIEFS

■ Ogle was allowed to explain his beliefs to some extent, but the trial court cut

3. "Well, my understanding of the pamphlet is that it encourages people to use their own sense of conscience and their own sense of justice in arriving at verdicts, whether it is a verdict to acquit or a verdict to convict, but, in either case, a jury, I think the primary function of a jury, the way that I understand this book, is to use their own sense of morality, their own sense of conscience in arriving at their decisions, so that we can then use the people through their function in the jury box as a tempering influence on our overall system of justice in this country."

him off after a certain point. The whole purpose of the small pamphlet, "A Handbook for Jurors," was to persuade the juror that if his conscience dictated against enforcement of the particular law, that the Constitution and nature of the jury system allowed him to vote for acquittal regardless of what the law said. As we mentioned above, he said that he had changed his policy and no longer recommended distribution to jurors. He explained his understanding of the pamphlet as being to encourage people to use their own sense of conscience and their own sense of justice in arriving at verdicts, whether it is a verdict to acquit or a verdict to convict, but in either case "the primary function of a jury, the way that I understand this book, is to use their own sense of morality, their own sense of conscience in arriving at their decisions, so that we can then use the people through their function in the jury box as a tempering influence on our overall system of justice in this country."

It is not surprising that the court stopped this line of questioning because it is entirely contrary to law. Any system must be based upon upholding the law. To empower each individual to decide whether the particular law is worthy or runs against the individual's private beliefs would necessarily produce a lawless society and chaos. Quite apart from the fact of invalidity of such a system, it has no practical social value. Such a government would fail in a very short time, for carried to its logical conclusion it is anarchy and revolution. The revolutionary government would not abolish taxes.

This concept is merely a variation of the idea that individual good faith is a complete defense. This is not accepted either, and neither defendant nor his counsel maintain that subjective good faith is a defense to the commission of a crime. Nevertheless, they use this individual conscience analysis in an attempt to disguise the good faith.

In summary, the efforts of the defendant to extend his testimony after having made his explanation were properly curtailed. Judge Arraj had been liberal in allowing him to restate theories to the point that no one present could have failed to understand his premise. The judge did on one occasion mention that he did not want him to present a Fourth of July speech. This characterization was not inaccurate in that the speech offered was not based upon our law or upon our system of government. In other words, our system is one of laws and not of men.

## IV.

### THE REJECTION BY THE TRIAL COURT OF TENDERED INSTRUCTION NUMBER 4, WHICH CONTAINED THE DEFENDANT'S DEFINITION OF THE TERM "CORRUPTLY"

The tendered instruction mentioned is as follows:

The word "corruptly" means an endeavor, done with a wicked or evil purpose, to influence a juror in the performance of his or her duties or to influence, obstruct or impede the due administration of justice. Specific intent to impede or influence a petit juror or to impede or obstruct the administration of justice is an essential element of the offense here charged.

The argument of appellant that the court erred in not giving his tendered instruction is that the above-quoted instruction was his theory of the case. While he concedes that the judge did not have to give the exact language, he claims the judge was required to embody his theory in an instruction. The instruction given was not substantially different from that which was requested. The court defined the key words in the charge as follows: "Now, the word "endeavor" means any effort to attempt to accomplish the evil purpose that the statute was designed to protect, and the word "corruptly" means any endeavor to influence a juror in the performance of his or her duties or to influence, obstruct or impede the due administration of justice, and the term "due administration of justice" contemplates and imports a free and fair opportunity for ev-

ery litigant in a pending case to have a just and honest trial without outside corrupting influences."

We hold that the court's instruction sufficiently advised the jury on the subject. As we pointed out above, the term "corruptly" in this present context, at least, means acting illegally or unlawfully. The defendant is seeking to add to that by requiring, in addition, a wicked or evil purpose. The court's instruction used the term "evil," but limits it to the endeavor to accomplish that which the statute was designed to protect rather than evil purpose in the sense of a fiendish motive. Such a motive is not a necessary element of the crime. The instruction would, had it been given, have been potentially confusing to the jury.

The trial court's instruction was that which was adopted by Devitt & Blackmar, Federal Jury Practice and Instructions (3rd ed. 1977), § 32.05. Contrary to counsel's contention, *United States v. Partin*, 552 F.2d 621 (5th Cir. 1977), does not modify the original Devitt & Blackmar version. The case was merely cited in the pocket part of Devitt & Blackmar for information. The defendant in *Partin* objected to the form of the instruction. The court held that it was not plain error. The Court of Appeals for the Fifth Circuit did not endorse the instruction. Contrary to that which the appellant maintains, the refusal of Judge Arraj to include the words "evil, bad motive and evil or wicked purpose" was not, in our opinion, necessary.

## V.

### THE INSTRUCTION ON INFERRED INTENT

It is next urged that the trial court committed error by giving an instruction to the effect that what a defendant does or fails to do may indicate intent or lack of intent to commit the offense charged, and it is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. The instruction informs the jury that they may draw the inference that the accused intended the natural results of acts he knowingly did or failed to do.

Counsel has conceded that there was no objection made to the giving of this instruction. *See United States v. Tijerina*, 407 F.2d 349, 355 (10th Cir. 1969), and *United States v. Woodring*, 464 F.2d 1248, 1251 (10th Cir. 1972). Under these cases, the plain error test was held to have been applicable. Counsel says that we should establish a rule that the giving of the instruction, even though attended by a proper instruction on burden of proof, is error regardless of whether there was objection. He relies on the Fifth Circuit case of *Mann v. United States*, 319 F.2d 404 (5th Cir. 1963).

The fact that there was no objection made, of course, weakens the position of the defendant-appellant. There is another factor which should be mentioned. The Supreme Court at the last term in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, (1979), considered an instruction which was somewhat similar but, at the same time, very different. There the trial court in a homicide case instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." The Supreme Court pointed out that this was given over the petitioner's objection and that such instruction had the effect of shifting the burden of proof on the issue of purpose or knowledge. The defendant was found guilty, and the conviction was affirmed by the Supreme Court of Montana. The Supreme Court of Montana recognized the evil of shifting the burden of proof by means of a presumption. However, the Montana court ruled that the instruction did not violate due process standards. The Supreme Court, however, condemned the instruction, citing its opinions in *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). It held that since the jury may have interpreted the instruction as mandatory, the giving

of it was a violation of the petitioner's constitutional rights. The basic premise for the decision was that the giving of an instruction requiring the jury to presume from a proven fact, the existence of another fact as to an element of the offense overrides presumption of innocence.

 In our view, *Sandstrom v. Montana, supra,* is clearly distinguishable from the case at bar so that we need not base our decision on the proposition of alleged plain error. The instruction in our case simply allowed the jury to draw a permissive inference from a basic fact, a process which is nothing more than the deductive reasoning which is employed in the consideration of all circumstantial evidence. To allow the jury to pursue a deductive process on a permissive basis is far different from advising the jury that the law *presumes* that a person intends the ordinary consequences of his voluntary acts. The latter form reverses the burden of proof, the former does not.

## VI.

### OMISSION OF "CORRUPTLY" FROM FIRST AMENDMENT INSTRUCTION

 We next consider the further contention of the defendant that it was error to omit the word "corruptly" in instructing the jury on the defendant's First Amendment rights.

In connection with the First Amendment, the court finally instructed the jury that whether there was First Amendment protection for the distribution of "A Handbook for Jurors" pamphlet depended on whether the contents would influence the jury. It is argued that the term "corruptly" should have been put in. However, the term "corruptly" in its proper context was used in the instruction and the court gave its definition of it which we have held to be sufficient.

We find no error in this instruction.

## VII.

### CLAIM OF FIFTH AMENDMENT PRIVILEGE

 The next contention is that the district attorney improperly asked Mrs. Lagoni whether they discussed in the defendant's tax class the W–4 forms. She said "Yes." The district attorney continued "And during the period of time that you took this class, did you change your W–4 form?" She said "I would like to refuse to answer that on the grounds of my Fifth Amendment rights." Counsel for the appellant maintains that this was a deliberate effort to bring about a Fifth Amendment claim on the part of the witness. The trial court ruled to the contrary. The U.S. Attorney said "I don't believe she has a Fifth Amendment right with respect to that question. It never entered my head she would have a Fifth Amendment right whether or not she changed or withdrew a W–4." The court said "That's right, she can change her form. Even my form isn't accurate. I don't claim being 65 years old and I give them a little extra each month. He can't go any further." The court added further, after the defense counsel objected, "Well, he is not going into it any more. I would just as soon that he hadn't gone into it, but I don't think it is that damaging. Don't go into it any further."

There is no reason to believe that the U.S. Attorney realized that she would use this claim in response to the question asked. That being the case, we disagree with the present argument that this was asked for the purpose of having her claim privilege in open court before the jury. The trial judge believed that counsel did not expect the answer, and we do not agree that the ruling of the trial court constituted error.

\* \* \* \* \* \*

 Finally, there is a considerable body of law which holds that mistaken belief in the unconstitutionality of a law is not a good defense in a criminal action. A brief annotation which is reported in 61 A.L.R. 1148, 1154 deals with the question whether a mistake of law is a defense in a criminal case. It holds that it is not. This annotation is a note to the Tennessee case of *Hunter v. State,* 158 Tenn. 63, 12 S.W.2d 361. In *Hunter,* a public officer believed

that a statute which deprived him of fees of his office to which he had been formerly entitled was unconstitutional. He set up this belief as a defense to a charge of embezzlement growing out of his conversion of the fees in accordance with the prior custom. The Tennessee court refused to accept his contention. The court recognized that mistake of fact is capable of constituting a defense, whereas a mistaken belief as to the law can never justify the commission of a crime. The court said that the authorities uniformly recognize and give effect to this distinction, sometimes excusing the accused in a fact situation, but refusing always to do so in the law area. The court said the claim of belief in the unconstitutionality of the law comes within the latter class. It is a plea of ignorance of the law which is never admissible to excuse crime.

The note cited declares:

It is generally held that mistaken belief in, or reliance upon, the unconstitutionality of a statute, is no defense to a criminal prosecution.

61 A.L.R. 1154.

A number of other cases are annotated. One which is very much in point here is *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878). In *Reynolds*, it was held that although freedom of religion is guaranteed by the Constitution, religious belief was not a valid defense in a prosecution for bigamy. Reliance was on the religious belief itself. In ruling that a religious belief could not constitute a defense, the Court explained its decision in this way: that a criminal intent is generally an element of a crime, and every man is presumed to intend the necessary and legitimate consequences of what he knowingly does. Here, the accused knew that he had been married and that his first wife was living. He was also aware that there was a law that prohibited his having a second wife. Under those circumstances, the Court said that he was guilty of the crime, and that while ignorance of a fact could sometimes be taken as evidence of a want of criminal intent, ignorance of the law could not. The Supreme Court continued that the only defense of

the accused in the case before it was his belief that the law ought not to have been enacted. The Court finally concluded: "It matters not that his belief was a part of his professed religion; it was still belief and belief only." When the offense consists of a positive act knowingly done it would be dangerous, the Court said, to hold that the offender might escape punishment because he religiously believed the law he knowingly broke ought never to have been made. "No case, we believe, can be found that has gone so far."

A Tenth Circuit case, *Warren v. United States*, 177 F.2d 596 (10th Cir. 1949), *cert. denied*, 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584 (1950), in an opinion by Chief Judge Phillips, ruled that membership in the Unitarian church, the doctrine of which was believed by the defendant to oppose war, did not constitute a defense to charges that the defendant had advised his stepson not to register for the draft as required by law. The defendant testified that he believed war to be a great evil, that without compulsory military training war could not be carried on, and that war could be prevented if the draft were not enforced. He also said that he believed certain laws to be detrimental to man as a whole and that they therefore should be disobeyed. He was shown to have frequently instructed his stepson as to moral, social and religious matters in accordance with his beliefs. He admitted that he advised his stepson not to register and told him that he should go to Canada and that he would pay his expenses. This court rejected the contention of the defendant that he had the right and duty to give his stepson religious training and instruction and in good faith to teach him that war was wrong and that registration is likewise wrong. The court concluded, however, that the First Amendment did not justify his counseling his stepson to refuse or to evade registration.

The court said:

It is one thing for a person to entertain religious beliefs, to express those beliefs, and to teach them to his children. It is another thing to counsel and urge viola-

tion of valid penal legislation. "Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,— freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.

177 F.2d at 599–600.

The court distinguished between interference with religious belief, which the government cannot do, and interference with practices, which they can do, and added that man may not excuse his practices that are contrary to law because of his religious beliefs.

In support of its opinion, this court cited the well-accepted proposition that one with innocent motives, while awaiting a judicial decision upholding a doubtfully valid law, might regard it as not obligatory prior to its having been construed and upheld by a court, saying that this was not the situation in the case before it. Similarly, it is not the case here. There can be no doubt as to the constitutional validity of the statute which prohibits jury tampering.

Other cases are annotated in 21 Am. Jur.2d, *Criminal Law* § 95 (those dealing with the mistaken belief of the constitutionality of a statute, hold that it is not a valid excuse), § 92 (religious belief cannot be accepted as a justification of an act made criminal by the law of the land), § 85 (distinguishes a good motive from the intent to commit a crime). *See also* 22 C.J.S. *Criminal Law*, §§ 48, 51, which contains a discussion on ignorance or mistake of law as not a defense, and religious belief as not being justification or excuse for commission of a crime.

We conclude that the trial court was correct in submitting the cause to the jury, and also in its interpretation of the applicable law in this case. There is no support for the defendant's position that a conscientious belief that a law is unconstitutional or contrary to the common law constitutes a good defense. This is an ill-founded notion.

Accordingly, the judgment of the district court should be and the same is hereby affirmed.