

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. PD-1347-09
---

**ALFRED ISASSI, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### KLEBERG COUNTY
---

      COCHRAN, J., delivered the opinion of the Court in which WOMACK, JOHNSON, KEASLER and HERVEY, JJ., joined. KELLER, P.J., filed a dissenting opinion in which PRICE and HOLCOMB, JJ., joined. MEYERS, J., not participating.

### OPINION

On evidence that appellant–the then Kleberg County Attorney–made some phone calls in an unsuccessful attempt to cut short a criminal prosecution of his aunt, the jury convicted him of two counts of the rarely charged misdemeanor offense of "improper influence."[1] The

---

[1] TEX. PENAL CODE § 36.04(a). Section 36.04 provides that a person commits the offense of improper influence "if he privately addresses a representation, entreaty, argument, or other communication to any public servant who exercises or will exercise official discretion in an adjudicatory proceeding with an intent to influence the outcome of the proceeding on the basis of

Corpus Christi Court of Appeals held that the evidence was legally insufficient to show he made the calls "with an intent to influence the outcome of the proceeding on the basis of considerations other than those authorized by law," as required by the statute.[2]  We granted review[3] and will reverse.

## I.

### A.     The Facts.

On August 5, 2005, appellant's aunt, Anna Linda Gonzalez, ran a red light in Kingsville.  Constable Rafael Campos followed her with his lights flashing.  Instead of pulling over, Ms. Gonzalez drove home, went inside her house, and failed to answer the constable's knock.  Instead, she called appellant; he was her nephew and also the elected county attorney.  Appellant told her to cooperate, so she did.  Constable Campos arrested Ms. Gonzalez for evading arrest with a vehicle and took her to jail.  Ms. Gonzalez was released on a personal bond with documents requiring her to report to pretrial services within twenty-four hours and to report to the 105th District Court on September 8, 2005.

---

considerations other than those authorized by law."

[2] *Isassi v. State*, ___ S.W.3d ___, No. 13-08-00510-CR, 2009 Tex. App. LEXIS 5822 (Tex. App.—Corpus Christi July 30, 2009).

[3] We granted these two grounds for review:
1.     Did the Court of Appeals, in a case of first impression, misconstrue the intent requirement of Section 36.04 in the absence of guidance from this Court and thereby erroneously acquit the Defendant Alfred Isassi?
2.     Did the Court of Appeals fail to defer to the jury's credibility determinations in conducting its legal sufficiency review pursuant to *Jackson v. Virginia* when it granted a judgment of acquittal on all counts based on legally insufficient evidence of illegal intent?

Ms. Gonzalez did not report to pretrial services, but three days after her arrest, appellant called Maria Elana Hernandez, the pre-trial-bond coordinator for the 105th Judicial District.[4]  Ms. Hernandez knew appellant, both as county attorney and as a former assistant district attorney.  Ms. Hernandez testified that appellant told her that Anna Linda Gonzalez had been arrested for evading arrest with a vehicle, a felony charge, and that she did not need to report to the office for pretrial services.  Appellant stated that the arrest "was done by Constable Ralph Campos and it was an investigation on him at the time due to another incident, another arrest on . . . another individual and that the case was going to get rejected." Appellant said that "he already had spoken to the DA's office and that the case was going to be rejected."  Ms. Hernandez made the following note on her copy of the order to appear in court: "Will not be prosecuted by DAs or county attorney's office as per Alfred.  She was not pretrialed in jail."  Because of this call, pretrial services excused Ms. Gonzalez' noncompliance with standard felony-reporting requirements for about six weeks.  Appellant never told Ms. Hernandez that Ms. Gonzalez was his aunt.

On August 24, 2005, the district attorney's office received the evading-arrest case from Constable Campos.  A week later, appellant called Assistant District Attorney Aida Trevino who was a friend of appellant's.  She had known him since before she went to law school, when she worked as a secretary at the district attorney's office and appellant was an assistant district attorney.  Ms. Trevino testified to their conversation:

---

[4] At this time, the 105th District was composed of Nueces, Kenedy, and Kleberg counties.

He said, "Do you have a–do you happen to have a case on Anna Linda–or Anna Gonzalez?" And I was like, "Well, let me look it up." And . . . I said, "Yes, it's a pending case." And so he said, "Well,"–he says, "Ralph Campos is the one that arrested her." I said, "Yeah, that's what I'm showing. It's still pending." He says, "Well, did you know that [First Assistant District Attorney] Mark Skurka has a pending investigation–an open pending investigation on Ralph Campos?" And I said, "No, I didn't know that." He says, "Yeah." He goes, "And they're not going to prosecute the case." I was like, "Okay." I said, "Well, let me go ahead and check with him." I said, "If that's the case, then I'll go ahead and–and dump the case," because–and I remember telling him, I was like, "One less case I have to deal with." I was like, "You know how much work there is up here." So I was like, "We'll go ahead and dump it as soon as I–I get that."

Ms. Trevino testified that appellant never told her that Anna Linda Gonzalez was his aunt, but that if he had, "I think I would have–I would have hesitated as far as following–following up on–on the comments that were made." Ms. Trevino soon learned that Ms. Gonzalez was a member of the local grand jury and that she was being investigated for failing to disclose a prior theft conviction during impaneling.

On September 13th, pretrial services sent Ms. Gonzalez a letter stating that her evading arrest with a vehicle case was pending and that she had to comply with the notice requiring her to report to pretrial services. On September 15th, Ms. Gonzalez was removed from the grand jury. The next day, appellant called Aida Trevino again, but by then she had discovered that Ms. Gonzalez was his aunt. It was a short conversation.

. . . [I]t was the day after the judge issued the order removing her from the grand jury and he called me once again on the phone . . . . And what he said to me was, "Hey, Aida, I have Anna Linda Gonzalez here in my office here right now." He's like, "Can she come talk to you?" And I said, "Alfred"–I was like, "We–we're probably going to indict her. You know, she's been removed from the grand jury." I was like, "I have nothing to say to her," and

he said, "So you don't want to talk to her?"  And I said, "I have nothing to say to her."  I said, "We're probably going to indict her.  And you should know better than that."  And that was–that was that.

Appellant called pretrial services the next day and spoke to Officer Jimenez, yet another acquaintance.  He referred to the letter that Ms. Gonzalez had received and asked if she still needed to report as there was a possibility that the district attorney was not going to pursue the case because the arresting officer was under investigation.  Appellant said that he had talked to Ms. Trevino, the assistant district attorney.  Officer Jimenez said that Ms. Gonzalez still needed to report because it was standard procedure, but once documentation of the dismissal was in hand they would close the case.  Ms. Gonzalez reported to pretrial services that same day and was given the conditions of her bail pending trial.

In February of 2006, Ms. Gonzalez was indicted for the felony offense of evading arrest with a motor vehicle.  In late July, that case was dismissed as part of a plea agreement reached in the aggravated perjury case related to her grand-jury impaneling.

Two years later, a jury convicted appellant of two counts of improper influence–a class A misdemeanor–on evidence of his interference in his aunt's case.  He was sentenced to one year in jail, probated for six months.

**B.      The Court of Appeals Opinion.**

On direct appeal appellant argued–*inter alia*–that the evidence adduced at trial was legally insufficient to prove–as the offense of improper influence requires–"an intent to influence the outcome of the proceeding on the basis of considerations other than those

authorized by law."  The court agreed and stated,

> The evidence adduced at trial established that Isassi contacted both Trevino and Hernandez in order to advise them that Constable Campos was under investigation, and that the First Assistant District Attorney did not intend to prosecute Gonzalez for this reason.  There was no evidence that Isassi offered to do anything, either in his private capacity or in his capacity as County Attorney, in exchange for a favorable result in his aunt's case.  Nor was there any evidence that Isassi gave any information to Trevino and Hernandez that those individuals could not lawfully utilize in determining how to exercise their official discretion.[5]

Rather, the "intent of the District Attorney to drop the case against Gonzalez was indeed a factor that Trevino and Hernandez were clearly authorized by law to consider in making official decisions regarding Gonzalez's case."[6]  And while "Isassi's position as Kleberg County Attorney and his failure to disclose his relationship with Gonzalez may have given his communications with Trevino and Hernandez an aura of impropriety, . . . the fact remains that Isassi did nothing that a private citizen could not do–he merely advised Trevino and Hernandez that the case against his aunt was weak and would not be prosecuted."[7]

## II.

**A.    Standard of Review.**

In assessing the legal sufficiency of the evidence under *Jackson v. Virginia*,[8] "we

---

[5] *Isassi*, 2009 Tex. App. LEXIS 5822, *9-10.

[6] *Id.* at *11.

[7] *Id.*

[8] 443 U.S. 307 (1979).

consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt."[9]  But "our role is not to become a thirteenth juror.  This Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder."[10]  Rather, we defer to "'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"[11]  This same standard applies equally to circumstantial and direct evidence.[12]  "Our role on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally."[13]

## B.      The Improper Influence Statute.

A person commits the offense of improper influence "if he privately addresses a representation, entreaty, argument, or other communication to any public servant who exercises or will exercise official discretion in an adjudicatory proceeding with an intent to influence the outcome of the proceeding on the basis of considerations other than those

---

[9] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19).

[10] *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

[11] *Hooper*, 214 S.W.3d at 13 (quoting *Jackson*, 443 U.S. at 318-19).

[12] *Laster v. State*, 275 S.W.3d 512, 517-18 (Tex. Crim. App. 2009).

[13] *Id.* at 518.

authorized by law."[14]  Only the intent element is at issue here.[15]  As the court of appeals

noted, the phrase–an intent to influence the outcome of the proceeding on the basis of

considerations other than those authorized by law–is not further defined in the penal code or

in our case law.[16]

Although we have never construed the meaning of this statute, the improper influence

statute does appear in the Model Penal Code.  Section 240.2 covers threats and other

improper influence in official and political matters and includes four different offenses–one

of which, paragraph (d), mirrors the Texas statute.[17]  The offenses are "designed to reach

various means by which the integrity of government can be undermined."[18]  The Model Penal

Code commentary about paragraph (d) includes the statement that the provision deals with

---

[14] TEX. PENAL CODE § 36.04

[15] *Isassi*, 2009 Tex. App. LEXIS 5822, at *12 n. 2 ("Because the evidence was legally insufficient to support a finding that Isassi 'inten[ded] to influence the outcome of the proceeding on the basis of considerations other than those authorized by law,' we need not address whether the evidence was sufficient to establish (1) that his communications took place in the context of an 'adjudicatory proceeding' or (2) that Hernandez 'exercise[d] or [would have] exercise[d] official discretion' in such a proceeding. Moreover, because we find the evidence legally insufficient, we do not address the question of factual sufficiency.") (citations omitted).

[16] *Id*. at * 9.  The court of appeals said that it would therefore construe the phrase according to the fair import of its terms, to promote justice and the objectives of the penal code, including giving fair warning of what is prohibited and safeguarding conduct that is without guilt from condemnation as criminal.  *Id.*

[17] MODEL PENAL CODE § 240.2(d) ("A person commits an offense if he . . . privately addresses to any public servant who has or will have an official discretion in a judicial or administrative proceeding any representation, entreaty, argument or other communication with purpose to influence the outcome on the basis of considerations other than those authorized by law.").

[18] MODEL PENAL CODE §§ 240.1-240.7 explanatory note.

the subject of "*ex parte* communications made to judicial and administrative officers with the purpose of influencing improperly the outcome of official proceedings."[19]  The statute therefore "prohibits any communication designed to influence the outcome on the basis of considerations other than those authorized by law."[20]  The commentary notes the widespread social judgment that pressures and persuasions other than the offer of a benefit may obstruct the fair administration of justice,[21] so this provision is designed to reach improper influences short of bribery or threat.[22]  Although the drafters had considered using the phrase "corrupt" attempts to influence as used in the corresponding federal statutes,[23] it rejected that suggestion because "[c]overage only of 'corrupt' attempts to influence would either rob the provision of any significance or leave the courts with the wholly unstructured task of defining through criminal prosecutions the limits of appropriate *ex parte* contact."[24]  Thus,

---

[19] MODEL PENAL CODE § 240.2 Commentaries, vol. 3, at 49.

[20] *Id*. at 56.

[21] *Id.* at 50, 55 ("The prevalence of laws against improper influencing of jurors, masters, referees, and the like evidences a widespread judgment that pressures other than offer of benefit may obstruct the administration of justice. . . . Subsection (1)(d) is designed to reach improper influences by means short of bribery or threat.").

[22] *Id.* at 55.

[23] *See*, 18 U.S.C. §§ 1503 & 1505.

[24] MODEL PENAL CODE § 240.2 Commentaries, vol. 3, at 57 ("Private approaches to administrative officers are nearly always made on the basis of avowed good purposes, such as to avoid delay or to make sure that the true public interest (as conceived by the proponent) will be served.  Coverage only of 'corrupt' attempts to influence would either rob the provision of any significance or leave the courts with the wholly unstructured task of defining through criminal prosecutions the limits of appropriate *ex parte* contacts.").

the actor must "intend to influence the outcome on the basis of certain factors" and also "know that those considerations are not authorized by law."[25]

The commentary notes that a handful of states–including Idaho, Maine, Montana, New Hampshire, New Jersey, and Texas–have such statutes.[26] Very few state cases discuss the offense.  In one unpublished Montana case, the statute was used to indict the defendant for providing jury panel members with a nullification instruction.[27] The allegation was "that the Defendant mailed letters to prospective members of the Ravalli County jury panel during a time when the Defendant was charged with another criminal act that would go to trial before the jury panel.  The substance of the letters mailed by the Defendant was to the effect that a prospective juror, if selected to sit on a jury, had the absolute right to disregard the instructions of the Judge and vote for acquittal if the juror felt the law was bad."[28] The trial judge relied upon a federal case construing the corresponding federal improper influence statute and denied the defendant's motion to dismiss, which was based on the theory that "it

---

[25] *Id.*

[26] *Id.* at 57-60.

[27] *State v. Holland*, No. CR-95-53, 1995 Mont. Dist. LEXIS 929 (Mont. Dist. Ct. November 29, 1995); MONT. CODE § 45-7-102 (1)(a)(iv) ("A person commits an offense under this section if the person purposely or knowingly . . . privately addresses to any public servant who has or will have official discretion in a judicial or administrative proceeding any representation, entreaty, argument, or other communication designed to influence the outcome on the basis of considerations other than those authorized by law.").

[28] *Id.* at *1.

is error to not tell the jurors of a right they possess."[29]  Although jurors have the raw power to return a verdict that flies in the face of the facts and the law, they do not have a legal right to do so.  Jury nullification is not authorized by law, and thus the improper influence statute applies to the *ex parte* attempt to persuade jurors to exercise that raw, but lawless, power.[30]  Though other states have statutes similar to that in Texas, prosecutions under them have been rare–and usually involve threats, or, as above, efforts to tamper with a jury.[31]  The use of the improper influence statute in the manner that it was used here is, as far as we can tell, truly a matter of first impression in state courts.

---

[29] *Id.* at *7, 38-40 (relying on *United States v. Ogle*, 613 F.2d 233 (10th Cir. 1980)).  In *Ogle*, the defendant, the author of a non-mainstream tax handbook, attempted to influence a juror in a tax-protest case by having a third person, who knew both Ogle and the juror, call the juror and tell her to read a booklet about jury nullification.  The third person did make the call, but the juror immediately told the judge of the call.  Ogle's position was that he had a good-faith belief that jurors could disregard the law and nullify it if it runs against their personal beliefs.  *Ogle*, 613 F.2d at 235-36.

[30] *Holland* at *38-40; *see also Ogle*, 613 F.2d at 241 ("Any system must be based upon upholding the law.  To empower each individual to decide whether the particular law is worthy or runs against the individual's private beliefs would necessarily produce a lawless society and chaos.  Quite apart from the fact of invalidity of such a system, it has no practical social value.  Such a government would fail in a very short time, for carried to its logical conclusion it is anarchy and revolution.  The revolutionary government would not abolish taxes.").

[31] *See, e.g.*, *State v. Heffner*, 964 P.2d 736, 741-42 (Mont. 1998) (convictions for threats and improper influence in official matters affirmed on evidence that the defendants confronted state highway-crew members because they were upset that their swift travel on the road was impeded by the duties of the road-grader operator); *State v. Keating*, 949 P.2d 251, 259-61 (Mont. 1997) (conviction for threats in official matters affirmed; evidence showed defendant threatened deputies attempting to serve civil process at his home; rejecting argument that service of process was not a discretionary function that could serve as the basis of a charge of threats in official matters because, although service of process is a statutory duty, sheriff's department could use a variety of methods of serving process; it clearly "involves the power of choice among several courses of action," constituting a sufficient exercise of discretion to form a basis for charges of threats in official matters).

However, the corresponding federal statute, 18 U.S.C. § 1503,[32] prohibiting influencing or injuring a judicial officer or juror has been construed and applied in numerous cases. The distinction between the federal statute and the Texas statute is in the wording of the mens rea element. In the federal statute, the actor must "corruptly"[33] endeavor to influence a judicial officer or the due administration of justice; in the Texas statute, the actor must have "an intent to influence the outcome of the proceeding on the basis of considerations other than those authorized by law." As noted by the Model Penal Code commentary, the mens rea of the improper influence statute is both broader and more precisely defined than the equivalent mens rea under the federal statute.[34] Both statutes, however, criminalize conduct that obstructs or influences the due administration of justice if that conduct is undertaken with a corrupt or improper purpose.[35] The conduct itself might be lawful, but if it was performed for an improper purpose, it falls within the criminal

---

[32] 18 U.S.C. § 1503(a) ("Whoever corruptly . . . endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States . . . in the discharge of his duty, or . . . corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).").

[33] *See Ogle*, 613 F.2d at 238 ("Volume I of Bouvier's Law Dictionary defines the term 'corruption' as follows: 'An act done with an intent to give some advantage inconsistent with official duty and the rights of others.'").

[34] *See* MODEL PENAL CODE § 240.2 Commentaries, vol. 3, at 57.

[35] *See United States v. Cintolo*, 818 F.2d 980, 991 (1st Cir. 1987); MODEL PENAL CODE § 240.2 Commentaries, vol. 3, at 48, 54-57.

statute.[36] As Justice Holmes once noted, "Intent may make an otherwise innocent act criminal, if it is a step in a plot."[37] Thus, the "proper inquiry is whether a defendant had the requisite corrupt intent to improperly influence the investigation, not on the means the defendant employed in bringing to bear this influence."[38] With that general background, we turn to the present case.

**III.**

The court of appeals found that the State presented "no evidence" that appellant acted "with an intent to influence the outcome of the proceeding on the basis of considerations

---

[36] *See Cintolo*, 818 F.2d at 993 (otherwise lawful means can violate § 1503 if done with corrupt intent); *United States v. Baker*, 611 F.2d 964, 967-69 (4th Cir. 1979) (advice to grand-jury witness to invoke Fifth Amendment can violate § 1503 if it is given with a corrupt intent); *United States v. Fasolino*, 586 F.2d 939, 941 (2d Cir. 1978) (attempt to exploit special relationship with trial judge held to violate § 1503); *United States v. Griffin*, 589 F.2d 200, 206-07 (5th Cir. 1979) ("The obstruction of justice statute was drafted with an eye to 'the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.'") (quoting *Anderson v. United States*, 215 F.2d 84, 88 (6th Cir. 1954)); *United States v. Cioffi*, 493 F.2d 1111, 1119 (5th Cir. 1974) (noting that "any effort or any act, however contrived," if made with the requisite intent to obstruct or interfere, violates § 1503) (internal quotation marks omitted); *Cole v. United States*, 329 F.2d 437, 443 (9th Cir. 1964) (affirming conviction of defendant who had urged grand-jury witness to invoke his fifth-amendment right not to testify; while a witness "violates no duty to claim it, . . . one who . . . advises with corrupt motive the witness to take it, can and does himself obstruct or influence the due administration of justice.").

[37] *Badders v. United States*, 240 U.S. 391, 394 (1916); *see also* WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., HANDBOOK ON CRIMINAL LAW 204 (1972) ("[T]here are a number of instances in which . . . inquiry into why an act was committed is crucial in determining whether or not the defendant has committed a given crime.").

[38] *United States v. Mitchell*, 877 F.2d 294, 299 (4th Cir. 1989) (using cases construing "corruptly" under § 1503 to interpret the term "corruptly" in § 1505, in an obstruction of congressional investigation case; affirming convictions because defendants improperly attempted to influence their uncle, a member of the congressional committee).

other than those authorized by law."

Notwithstanding that the means appellant used might be regarded as lawful when viewed in a vacuum, clear proof of an improper motive would serve to criminalize his conduct. It was the State's theory that, because she was his aunt, appellant attempted to influence (1) the district attorney's office to dismiss the charges against Anna Linda Gonzalez; and (2) the pretrial services department not to require her to report and adhere to the standard pretrial conditions of bond.[39] If appellant's motive and intent when he made these phone calls was to benefit his aunt by short-circuiting her prosecution for evading arrest, that was "an intent to influence the outcome of the proceeding on the basis of considerations other than those authorized by law." The law does not authorize the dismissal of criminal charges or the avoidance of standard bond conditions based upon the defendant's familial or personal relationship to another, be it a judge, county attorney, or other official.[40]

---

[39] The State's final argument to the jury included the following:
- [Y]ou need to ask yourselves is this the way you expect your elected officials to act here in your county? Would this have happened if it had been your family member that was charged with a crime? Would they have been treated the same way as Anna Linda Gonzalez and the defendant in this case?
- [Appellant] was trying to influence these people behind the scenes, behind closed doors to help his aunt, bottom line, and we know that he did that.
- And I don't have to prove that he actually influenced the proceeding, only that he had that intent, that intent to influence the proceeding, and that's what you need to decide, ladies and gentlemen. Is this elected official going to be given more than any of you would? Are his family members treated any differently than anybody else?

[40] One need only peruse the morning newspapers or google "ticket fixing scandals" to see the number and consistency of investigations into the improper dismissal of criminal cases, especially traffic and parking tickets, based upon a "special relationship" with judicial officers or court personnel.

If, on the other hand, appellant was simply exercising his public-spirited interest in good governance and his telephone calls were unrelated to his aunt and her welfare, then the evidence is insufficient to prove that he had an intent to improperly influence the proceeding.

Viewed in the light most favorable to the jury's verdict, the evidence of appellant's culpable intent included the following:

- Appellant's aunt called him from her home even before Constable Campos arrested her, asking for his advice; thus, he was involved in assisting his aunt from the very beginning of the incident.

- Three days after his aunt's arrest, appellant called Maria Elana Hernandez, the pre-trial bond co-ordinator and a person who knew him as county attorney and a former assistant district attorney. He told her that Ms. Gonzalez did not need to report because Constable Campos was being investigated for some other incident, so this "case was going to be rejected."[41]

- Appellant told Ms. Hernandez that he had already spoken to the D.A.'s office about this case and it was going to be rejected. In fact, appellant had not spoken to the D.A.'s office.

- Appellant did not tell Ms. Hernandez that Ms. Gonzalez was his aunt.

- A week after the district attorney's office received Ms. Gonzalez's case, appellant phoned Aida Trevino, an assistant district attorney, who was a friend of his. Appellant told Ms. Trevino that her boss, Mark Skurka, was investigating Constable Campos and "they're not going to prosecute" the case against Ms. Gonzalez.

- Mark Skurka testified that he never spoke to appellant about this case, that he had not reviewed the case filed against Ms. Gonzalez, and that he would never dismiss a case that he had not reviewed.

- Mark Skurka also testified that he never had a rule that Constable Campos's

---

[41] Later testimony established that, after the investigation was completed, Constable Campos was cleared on any criminal wrong-doing.

cases were to be dismissed pending the investigation.  He told Aida Trevino
to hold all of his cases "in limbo" until the investigation was complete.

- Appellant did not tell Ms. Trevino that Anna Linda Gonzalez was his aunt.

- Ms. Trevino testified that, had she known that Ms. Gonzalez was appellant's
  aunt, she would have hesitated to follow up on his comments.

- Appellant called Ms. Trevino again, after she had discovered from a third
  party, that Anna Linda Gonzalez was appellant's aunt.  She had also
  discovered by then that Ms. Gonzalez was going to be indicted for aggravated
  perjury.  She told appellant that she did not want to see or talk to Ms.
  Gonzalez.  She told appellant, "We're probably going to indict her.  And you
  should know better than that."

- Appellant then called pretrial services and talked to Officer Jimenez, another
  acquaintance.  He asked if Anna Linda Gonzalez had to report to receive bond
  conditions, and he told her that there was a possibility that the district attorney
  was not going to pursue the case against her because the arresting officer was
  under investigation.  He said that he had talked with Ms. Trevino, but he did
  not say that Ms. Trevino was upset that he had called her or that she was not
  going to do anything to help Ms. Gonzalez.

- Appellant never told Officer Jimenez that Anna Linda Gonzalez was his aunt.

Appellant's intent at the time he made these telephone calls was a matter for the jury
to decide as a question of fact, taking into account all of the evidence and the credibility of
the witnesses.[42]  In a sufficiency review, we afford the jury's inference of culpable intent as
much deference as we do to the evidence supporting proof of culpable conduct.[43]  As long

---

[42] *Jackson*, 443 U.S. at 319 (it is up to the factfinder "fairly to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate
facts.").

[43] *Laster v. State*, 275 S.W.3d 512, 520-21 (Tex. Crim. App. 2009) ("Just as
circumstantial evidence is reviewed under the same standard as direct evidence, circumstantial
evidence of intent is reviewed under the same standard as circumstantial evidence of other

as the jury's finding of a culpable intent "is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable."[44]

In holding that the evidence of intent was insufficient, the court of appeals first stated that there was "no evidence that [appellant] offered to do anything, either in his private capacity or in his capacity as County Attorney, in exchange for a favorable result in his aunt's case."[45]  This is true, but immaterial.  The improper influence statute does not require mutual consideration, or a quid pro quo.  That conduct is covered by the bribery statute.[46]

Second, the court of appeals stated that there was no evidence that appellant gave any information to Ms. Trevino and Ms. Hernandez that those individuals could not lawfully use in determining how to exercise their official discretion.  Even if this were true–if appellant had communicated only "the word on the street" that Constable Campos was under investigation–this would not "immunize Isassi's intent to benefit his relative by securing the dismissal of the felony charge against her and before that, an excuse or delay from conditions of pretrial supervision."[47]   The focus of the statute is on the state of the mind of the

---

elements.  In a sufficiency analysis, all of the evidence admitted at trial to support the conviction should be reviewed equally on appeal.").

[44] *Id.* at 523.

[45] *Isassi*, 2009 Tex. App. LEXIS 5822, at *9-10

[46] *See* TEX. PENAL CODE § 36.02.

[47] State's Brief at 14.

"influencer," not the propriety of the action or inaction of the "influencee."[48]

Third, the court of appeals held that there was no showing that appellant attempted to exercise influence on the basis of "considerations other than those authorized by law," in part because no law makes it illegal to inform a pre-trial bond coordinator or prosecutor or that a particular case will be rejected by the relevant prosecuting authority.[49]  And, we add– probably more to the point–no law makes it illegal to *mis*inform a pre-trial bond coordinator or prosecutor or that a particular case will be rejected by the relevant prosecuting authority. But again, the lawfulness of the underlying conduct is not determinative if appellant's intent was to obtain a dismissal because the defendant was his aunt.[50]  That is not a consideration "authorized by law."  In our system of justice, we decide if people are guilty of a crime based upon the facts and the law, not upon a familial or personal relationship to a public official.[51]

The court of appeals concluded that, because appellant did "nothing that a private citizen could not do," holding him "criminally liable for this behavior would be to obscure the line between routine communications with law enforcement officials and illegal attempts

---

[48] *See* cases cited in note 36 *supra.*

[49] *Id*.

[50] *See United States v. Baker*, 611 F.2d 964, 967-69 (4th Cir. 1979).

[51] *See United States v. Fasolino*, 449 F. Supp. 586, 587 (D.C.N.Y. 1978), *aff'd*, 586 F.2d 939 (2d Cir. 1978) (noting that a person who has personal knowledge of the defendant may submit sentencing letters in his support based upon that personal knowledge, but one who uses his personal relationship with the judge rather than personal knowledge of the defendant to make an *ex parte* oral plea to the judge may be covered by § 1503; "An out-of-court oral entreaty to the judge would always be suspect, mainly because one not standing in such a relationship to the judge usually would not be able to gain the judicial ear.").

to coerce those officials to make decisions based on improper considerations."[52]

The jury could have decided that appellant was simply doing his routine official duty as the county attorney in communicating to pre-trial service personnel and the district attorney's office problems about any case involving Constable Campos, and it was a serendipitous coincidence that the particular defendant involved happened to be his aunt.[53] *Sacré bleu!* The jury was, however, entitled to conclude, based upon all of the evidence and reasonable inferences from that evidence, that appellant's intent in making all of these telephone calls was to influence other public officials to dismiss the criminal case against Anna Linda Gonzalez because she was his aunt. An elected official may not manipulate and influence the judicial system to help a family member avoid conditions of pretrial supervision and prosecution for a felony. The Legislature, in this rarely invoked law, has forbidden it, and the jury, in this case, reasonably and rationally concluded, beyond a reasonable doubt, that appellant had that intent to improperly influence the outcome of his aunt's criminal case on a basis not authorized by law.

We therefore reverse the judgment of the court of appeals and remand the case to that court for further proceedings consistent with this opinion.

---

[52] *Isassi*, 2009 Tex. App. LEXIS 5822, at *11.

[53] *See Baker*, 611 F.2d at 968-69 (finding sufficient evidence to prove that defendant's motive in attempting to persuade grand-jury witnesses to exercise their Fifth Amendment right not to testify was to protect himself rather than inform witnesses of their constitutional rights; defendant's argument "that his motives were pure and that he acted only in the best interests of the two witnesses is an argument properly addressable only to a jury which, as we hold, had a secure evidentiary base in the instant case to reject it.").

Delivered: October 6, 2010
Publish