**Opinion filed February 21, 2013**



## In The

# Eleventh Court of Appeals

_____

## No. 11-11-00045-CR

_____

## YUNSHUN DEMETRIC HARRIS, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**

**Midland County, Texas**

**Trial Court Cause No. CR37358**

### M E M O R A N D U M   O P I N I O N

The jury convicted Yunshun Demetric Harris[1] of the offense of aggravated assault causing serious bodily injury.  After Harris entered a plea of true to an enhancement paragraph, the trial court assessed her punishment at confinement for six years, and it sentenced her accordingly.  We affirm.

---

[1]There are two different spellings of Harris's first name in the clerk's record.  This spelling appears to be the correct one.

Harris presents us with four points of error. In Point of Error No. 1, Harris challenges the sufficiency of the evidence to support the verdict of the jury. Her Point of Error No. 2 is related to the first in that Harris argues that, because the jury's verdict was based upon insufficient evidence, she was deprived of her "due process" rights.

We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *Brown v. State*, 381 S.W.3d 565, 573 (Tex. App.—Eastland 2012, no pet.) (citing *Jackson*, 443 U.S. at 314, 318 n.11, 320). If we find that the evidence is insufficient under this standard, we must reverse the judgment and enter an acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 40–41 (1982).

The evidence shows that on July 16, 2009, Amiy Christine Stratton, the victim, lived in a room that she had rented in a house occupied by Michael (Mike) Jordan. Amiy testified that, on that evening, when she came in from work, Ashley Marie Velez; Harris; Mike; a person named Donnie; and a man Amiy had been dating, Cory, were there. They had been hanging out there for days. Mike was "sick" of everyone being there, and he told Amiy that he wanted them gone by midnight. The task was apparently Amiy's to be sure that the others were gone by then. She told them that they had to be gone by midnight, and as that hour approached, she put more pressure on them to leave. She was afraid that, if they did not leave, she would lose her place to stay.

Harris and Velez did not have any means of transportation. Amiy told them that was not her problem and that they needed to leave. As it continued to get later in the evening, Amiy began to feel that something bad was about to happen. She noticed that Harris and Velez were

whispering to each other as they sat next to each other on a couch in the living room; they were also glancing at Amiy, and she felt that she needed to leave.

Around 11:30 p.m., Amiy phoned Stephanie Stephenson, a friend's sister, and begged her to come get her. Stephanie and Amiy talked on the phone until Stephanie arrived at Mike's house. When she was on the phone with Amiy, Stephanie heard "[l]ots of commotion" going on in the background, like "hollering, yelling," directed at Amiy.

When she arrived at Mike's house, Stephanie told Amiy to come out. As Stephanie walked toward the house, Amiy started out the door. Before Amiy could get out of the house, she was "grabbed behind her neck and pulled back into the house." Mike slammed the door and locked it.

Amiy testified that it was Harris who grabbed her by the throat and pulled her back inside the house. Amiy fell to her knees and felt as though she was going to pass out. Harris was on top of her, and that is when "[Velez] got [her]." Velez was hitting her, and Harris was "pounding [her] head into the ground." Amiy's head hit the wood floor "over and over and over." She was bleeding from her ears, mouth, and nose. She began praying because she "thought that was it."

Finally, Amiy heard a female voice say, "That's enough. You're killing her." Harris released her grip on Amiy's throat, and she finally got a gasp of air. It was some time before Amiy remembered anything more about the incident or its aftermath; she at first knew only that she woke up in the hospital ten days later.

Stephanie was watching the assault through a window in the locked front door. Amiy was on the floor, and "they were just pounding her." Harris was in front of Amiy, Velez was on Amiy's back, "and they were just pounding -- you could hear the thunk -- you know, the thunking sound, the way they were pounding her." When the door opened, Stephanie saw Mike trying to get Velez and Harris off Amiy. As he got one of them off and turned to get the other, the first one started again. Mike finally "broke up the altercation," and Amiy came out. Amiy identified her assailants as Velez and Harris. "[Amiy] had been beaten up pretty bad" and was bleeding profusely from her mouth; her hair "was just coming out by the wads." Stephanie testified that Amiy was a small girl—about 120 pounds. Harris was a "[p]retty good-sized girl." In Harris's testimony before the jury, she said that she was quite a bit bigger than Amiy, and she referred to herself as "formidable."

3

After Amiy came out of Mike's house, she did not want to go to the emergency room, although she was in a lot of pain and was crying. She said that she hurt really bad. Stephanie considered her mother's home to be a safe place to stay; Stephanie took her there and then went home.

The next morning, Stephanie returned to her mother's house to check on Amiy. Amiy's face was swollen, and she was in a lot of pain. She had marks all over her neck. "She just looked really bad." Stephanie left again, and when she returned later, Amiy was not there. The next time that Stephanie saw Amiy, Amiy was in the hospital on life support.

Donald Ray Jackson Sr. and another person took Amiy to the hospital. Jackson rented a house from Mike that was behind Mike's house. While there was some early confusion in Jackson's trial testimony, ultimately, on redirect examination, Jackson testified that, as Amiy had requested, he picked her up from Stephanie's mother's house the day after the assault. Jackson took Amiy to his house before he took her to the hospital later that day.

On July 17, 2009, hospital personnel contacted Jason Stratton, Amiy's estranged husband, and asked him to come to the hospital to sign release forms related to Amiy's treatment. Jason thought that they were divorced, but they were not. When he saw Amiy, she was on a ventilator, unresponsive, and unable to speak to him. Jason told hospital personnel to do whatever they had to do to keep her alive. Her prognosis was "very bleak." Hospital personnel later told the investigating detective that it did not look like Amiy was going to make it.

Jason saw Amiy four to seven days later, and she still was not coherent, was not communicating, and did not recognize him or anyone else.

Milton Lynn Kirby also saw Amiy while she was in the hospital. Amiy worked for Kirby in his landscaping business. A friend of Amiy's called him and told him that Amiy was in the hospital. When he saw Amiy, she was not responsive, "out of it," and did not know who he was. He noticed a tremendous amount of swelling; her eyes were swollen shut. Kirby testified that it was probably a week before Amiy "even knew what town she was in." The scars on her face were still visible at the time of trial.

Officer David Olvera was a patrol officer for the Midland Police Department. On July 20, 2009, he responded to a dispatch to go to the Midland Memorial Hospital to take a report in connection with an assault. Although he was told that Amiy was communicative when

4

she entered the hospital on July 17, she was not responsive when he saw her. When he saw her, she was on a ventilator, had suffered cuts and bruises, and had an infection around the torso area. He made a report and gave it to the detectives who subsequently investigated the case.

Detective Saul Bernal, with the Midland Police Department, saw Amiy in the emergency room after Officer Olvera notified him of the incident. Amiy was badly assaulted, in a coma, and unable to speak. During his investigation, he talked with Stephanie, Jason, and Kirby.

Later, on July 24, 2009, he saw Amiy again in the hospital. This time she was coherent. She was bruised badly, and her face was swollen. Amiy was able to tell Detective Bernal that Velez was one of her assailants. Stephanie also identified Velez from a police lineup. Detective Bernal arrested Velez.

On May 6, 2010, Velez pleaded guilty to the assault on Amiy. The trial court in that case sentenced her to confinement for four years. She was incarcerated but was returned to Midland County on a bench warrant to testify in Harris's trial.

Velez testified that she and Amiy had been friends. Amiy testified that they had been friends for about five years and had lived together until Amiy rented the room from Mike. Velez testified that they saw each other from time to time at Mike's and at other places. She also knew Harris (whom she knew as "Shun"). Velez, Harris, and Amiy "hung out" together.

After Velez got off work on July 16, 2009, she went to Mike's to see "old friends." When she got there, Harris, Mike, and Amiy were there. Amiy and Harris were arguing, and the argument escalated. Amiy tried to leave, but Velez pulled her by the hair, and Velez and Harris began to hit her. Velez tried to hit Amiy in the head, but thinks that she missed. She saw Harris hit Amiy in the head and face, pull her hair, and choke her.

Amiy was bleeding from her mouth and head. There was a lot of blood. Velez saw blood running down "the front of her shirt, the side of her head, all over her face." She gave Amiy a sheet to use to wipe the blood off her mouth. Amiy kept saying, "Please don't hurt me no more. Please don't hurt me no more."

Velez testified that someone knocked on the front door and that Amiy went outside. Velez said that she followed her out the door, hugged her, and apologized to her. When a lady drove up in a white car, Amiy left with her.

Amiy testified that she was not able to remember several people as well as many things associated with the assault when she woke up from the coma. She talked to Detective Bernal,

but later realized that some of what she told him was incorrect. It was not until she was out of ICU and on the "rehab floor" that she was able to remember fully what had happened at Mike's house. Reggie, Harris's cousin, came to see her. Amiy testified that, as soon as he entered the room, "I remembered everything, everything came back."

After Amiy had been released from the hospital, she saw Harris at a church, and Harris wanted to talk to her. Harris told Amiy that she did not do "this to [her]." Harris told Amiy that Amiy had a tooth infection that caused her to go into a coma. Harris later testified that Amiy did have an abscessed, loose front tooth as well as some other bad teeth. She testified that Amiy had complained about her teeth and that she, inasmuch as she was a licensed CNA and worked for a doctor, had looked in Amiy's mouth and had also noticed that Amiy's breath had a foul odor. She had cautioned Amiy to "see about that."

Harris also told Amiy that Amiy had cut her with a box cutter. At trial, Amiy denied that she had a box cutter and testified that, "if I would have had a box cutter, I'll be honest, she would not have been able to choke me because I would have gotten free."

After the encounter with Harris at the church, Amiy contacted law enforcement officers, and on April 22, 2010, they showed her another photo lineup. She had been unable to identify Harris in the first lineup they had shown her earlier during her initial hospital stay because Harris's photograph was not in it. When the earlier lineup was prepared, Harris had not been implicated in the assault at that time. Instead, another person not connected with the assault had been implicated because she had a name that, when shortened, could possibly be similar to "Shun," the nickname by which Harris was known. This other person's photograph was included in the lineup, but no one identified her as being involved in the assault. Amiy was able to identify Harris quickly in the second lineup in which Harris's photograph was included. Some eleven months after the assault, Harris was arrested.

Harris testified that she had gone to sleep in one of the unused bedrooms in Mike's house. She woke up, got out of bed to go to the bathroom, and then returned to bed. She had not yet gone back to sleep when she noticed someone coming into the bedroom; it was Amiy, and she was taking money from Harris's purse. Harris got up to stop her, and Amiy cut her on the leg with a box cutter. They had an altercation, and Amiy ran out of the room. Harris, bleeding, yelled for Mike to stop her, and Mike shut and locked the front door so that Amiy could not get out. Velez grabbed Amiy from behind, and Amiy fell to the floor. Harris was "tussling" with

6

Amiy and going "through her pockets, her legs, . . . her socks" and any other place where Amiy might have hidden the fifty dollars that she had taken from Harris. Meanwhile, Velez was hitting Amiy hard with her fists in the face and head. Although Harris saw Velez hitting Amiy, Harris never hit or choked Amiy. Amiy dropped the money, and Harris picked it up and immediately went back to the bedroom because her purse and other property were back there. Harris did not want someone to come through the back door and get her things. Harris testified that she never touched Amiy with her fists, that she never slammed Amiy's head into the ground, and that all of the other witnesses were mistaken.

Harris, in her first point of error, claims that the evidence is insufficient to support the jury's guilty verdict. We disagree. Before the jury could find Harris guilty of aggravated assault causing serious bodily injury, the State was required to prove beyond a reasonable doubt that, on the date and in the county alleged in the indictment, Harris intentionally, knowingly or recklessly caused serious bodily injury to Amiy by striking or hitting Amiy with her fists or by causing Amiy's head to hit or strike the floor. *See* TEX. PENAL CODE ANN. § 22.02(a)(1) (West 2011).

We have examined all of the evidence in the light most favorable to the verdict as we are required to do under the well-known *Jackson* standard set forth earlier in this opinion, and we have set that evidence out in this opinion. From that evidence, we hold that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Harris's Point of Error Nos. 1 and 2 are overruled.

In Point of Error No. 3, Harris argues that the prosecutor exceeded the bounds of proper jury argument. The argument to which Harris refers is a statement to the jury by the State that "[i]t was -- the testimony is uncontroverted that it was Yunshun Harris who did that to Amiy Stratton." Harris's attorney objected and told the trial court that several witnesses, including Harris, had controverted that testimony. Before the trial court ruled on the objection, Harris's attorney asked the trial court "to instruct the State [to] stay within the four parameters of acceptable closing arguments." The trial court immediately gave an instruction to the jury to the effect that the attorneys could argue the evidence and reasonable inferences from it but that their argument was not evidence. Harris made no further objection to the argument, and she did not seek further instructions or relief in this regard.

An error is not preserved for appeal unless the one claiming such an error has made a timely request or objection in which she states the grounds for the ruling desired from the court.

7

TEX. R. APP. P. 33.1(a). The one claiming error must pursue the objection or request to an adverse ruling. Generally, the complaining party must show on the record (1) that the complaint was made to the trial court by a request, objection, or motion that was timely and sufficiently specific enough to make the trial court aware of the grounds of the complaint and (2) that the trial court ruled adversely, or that it refused to rule, despite the objection. *Tucker v. State*, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999). If counsel does not pursue the objection to an adverse ruling, error is not preserved. Rule 33.1; *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex. Crim. App. 1991). Harris did not pursue her objection or request to an adverse ruling and has waived the error on appeal. Point of Error No. 3 is overruled.

In Point of Error No. 4, Harris complains of the trial court's failure to charge the jury on the law of self-defense. A defendant has the burden to produce sufficient evidence at trial to raise the issue of self-defense. *Hill v. State*, 99 S.W.3d 248, 250 (Tex. App.—Fort Worth 2003, pet. ref'd). Because self-defense is a justification defense, the defendant essentially is required to admit that she committed the conduct that resulted in the indictment in order to be entitled to a charge on self-defense. *Id.*; *see also Anderson v. State*, 11 S.W.3d 369, 372 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (a defendant must admit the offense to be entitled to an instruction on self-defense).

Rather than essentially admit that she committed the conduct that resulted in the indictment, Harris specifically denied it. Harris testified that she never touched Amiy with her fists, that she never slammed her head into the ground, and that all those who testified otherwise were mistaken.

When the State cross-examined Harris, the following exchange occurred:

Q. Ms. Harris, do you deny ever striking the victim, Amiy Stratton?

A. I did not strike Amiy Stratton.

Q. Did you ever cause Amiy Stratton's head to hit or strike the floor?

A. I did not.

Q. At any point in time from the bedroom to the front of the house, did you ever cause for [sic] either two of those things to happen?

A. I did not.

8

Because Harris denied that she committed the conduct that resulted in the indictment, she was not entitled to a charge on self-defense.  Point of Error No. 4 is overruled.

The judgment of the trial court is affirmed.


JIM R. WRIGHT

CHIEF JUSTICE


February 21, 2013

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.


9