# 1415-15

ORIGINAL

## IN THE
## TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

P.D. NO: __PD-1415-15__

BRANDON RAY MORGAN

　　　　　　PETITIONER

-V-

THE STATE OF TEXAS

　　　　　　RESPONDENT

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 0 7 2015

Abel Acosta, Clerk
FILED IN
COURT OF CRIMINAL APPEALS

DEC 11 2015

Abel Acosta, Clerk

## PETITION FOR DISCRETIONARY REVIEW
### FROM THE COURT OF APPEALS
### FOURTEENTH DISTRICT OF TEXAS AT HOUSTON
### NO: 14-14-00607-CR

## PRO-SE PETITION FOR DISCRETIONARY REVIEW

ORAL ARGUMENT
REQUESTED

RESPECTFULLY SUBMITTED
BRANDON RAY MORGAN
TDCJ-ID # 1944157
810 FM 2821
HUNTSVILLE, TEXAS
77349

# IDENTITY OF PARTIES

JUDGE AT TRIAL:
HON. BROCK THOMAS
338th DISTRICT COURT
1201 FRANKLIN ST.
HOUSTON, TEXAS 77002

PROSECUTING ATTORNEY AT TRIAL:
MS. SHANNON DREHNER - SBOT # 24074155
NATHAN MOSS- SBOT # 24051091
HARRIS COUNTY DISTRICT ATTORNEYS OFFICE
1201 FRANKLIN ST.
HOUSTON, TEXAS 77002

DEFENSE ATTORNEY AT TRIAL:
FRANKLIN BYNUM SBOT# 24069451
CRAIG STILL SBOT # 24033236
HARRIS COUNTY PUBLIC DEFENDERS OFFICE
1201 FRANKLIN ST. 13th FLOOR
HOUSTON, TEXAS 77002

DEFENSE ATTORNEY ON APPEAL
FRANKLIN BYNUM
HARRIS COUNTY PUBLIC DEFENDERS OFFICE
1201 FRANKLIN ST. 13th FLOOR
HOUSTON, TEXAS 77002

# TABLE OF CONTENTS

Section

Identity of the Parties and Counsel _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ i

Table of Contents _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ii

Index of Authorities _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ iii

Statutes _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ IV

Petition For Discretionary Review _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 1

Preliminary Statement _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 2

Procedural Statement _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 3

Statement of Facts _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 4

Issues For Review _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 5

ARGUMENT _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 6

Prayer _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 9

Certificate of Service _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 10

Appendix A _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ 20 pages

# INDEX OF AUTHORITIES

page

1. Cruz v. Beto, 405 US 319, 92 S.Ct. 1079, 31 L.Ed 2d 263 (1973)   2

2. Gross v. State, 380 SW3d 181, 188 (Tex Crim. App. 2012)

3. Haine v. Kerner, 404 US 519, 92 S.Ct. 594, 30 L.Ed 2d 652 (1972)   2

4. Hooper v. State, 214 SW3d 9, 15 (Tex Crim. App. 2007)

5. Winfrey v. State, 323 SW3d 875, 882 (Tex Crim App. 2010)

# STATUTES

page

Texas Penal Code § 2.05 .... 1

# IN THE TEXAS COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

BRANDON RAY MORGAN - PETITIONER

-V-

THE STATE OF TEXAS - RESPONDENT

## PETITION FOR DISCRETIONARY REVIEW FROM THE FOURTEENTH COURT OF APPEALS HOUSTON NO: 14-14-00607-CR

PRO-SE PETITION FOR DISCRETIONARY REVIEW:
TO THE HONORABLE JUDGES OF THE TEXAS COURT OF CRIMINAL APPEALS:

COMES NOW BRANDON RAY MORGAN, PETITIONER PRO-SE AND PRAYS THIS HONORABLE COURT WILL SEE AND LET PETITIONER FILE A PRO-SE PETITION FOR DISCRETIONARY REVIEW. PETITIONER WILL SHOW THE FOLLOWING:

## PRELIMINARY STATEMENT

Petitioner would respectfully request the Honorable Court to liberally construe the pleadings herein pursuant to Haine v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 LEd. 2d 652 (1972) (per curiam) (pro se pleadings are to be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers); and Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed 2d 263 (1972) (same).

-2-

# PROCEDURAL STATEMENT

On July 20, 2012 in cause No. 1354996, a complaint was filed and on September 25, 2012 petitioner was indicted for the offense of Murder. On Feburary 24, 2014 petitioner was re-indicted in cause No. 1419351 for the offense of Murder. On June 23, 2014, petitioner appeared before Hon. Brock Thomas in the 338th District Court of Harris County, Texas for Court trial in cause No. 1419351, petitioner plead Not Guilty. On July 21, 2014 Judge Thomas convicted petitioner of the 1st degree felony offense of Murder, Texas Penal Code §19.02 Murder as alleged in the indictment. All enhancement paragraphs were found to be true and petitioners punishment was assessed at Life in the Texas Department of Criminal Justice — Institutional Division. On July 21, 2014 petitioner filed a timely Notice of Appeal. Petitioners Direct Appeal to the Fourteenth Court of Appeals was submitted on July 25, 2014 and was Affirmed and Memorandum Opinion filed August 27, 2015. Petitioner filed a pro se motion for extension of time, which was granted on November 4, 2015, and the time to file was extended to November 30, 2015.

## STATEMENT OF FACTS

The trial court found appellant Brandon Ray Morgan guilty of murder and sentenced him to confinement for life. On May 3, 2012, appellant was at the home of Waynette ~~Marston~~ Wiebke. There was a fire around 1:00 AM on May 3, 2012. A cadaver was found inside the house after the fire. This is a phantom case.

# ISSUES FOR REVIEW

- The Court of Appeals has misconstrued a statute, rule, regulation, or ordinance. Rule 66.3(d)

- If the Court of Appeals reviews "the events occuring before, during, and after" why wasn't the unidentified man on the porch that night considered?

- With the unidentified man on the porch (See Reporter's Record, Cause # 1354496, 1419351 Vol. 16 pgs 99-100) wouldn't the hypothetical used to illustrate the case at barbe correct in proving that the trier of fact did draw conclusions based on speculation? Hooper v. State, 214 SW 3d 9, 15 (Tex Crim. App. 2007).

- Does the investigation by the State have to prove appellants connection to the phantom murder, or can exculpatory evidence be avoided in order to aid the States pre-disposition to suspect appellant.

# ARGUMENT

The Court of Appeals has misconstrued the holdings in <u>Hooper v. State</u>, 214 SW3d 9, 15 (Tex. Crim. App. 2007), <u>Winfrey v. State</u>, 323 SW3d 875, 882 (Tex. Crim App 2010), and <u>Gross v. State</u>, 380 SW3d 181, 188 (Tex. Crim App. 2012), and did not "look at [all] the events occuring before, during, and after" in reviewing the sufficiency of the evidence. The evidence shows a second party at the house that night, namely the unidentified man on porch the night of the crime, "no smoking gun", or a thorough investigation to prove or disprove appellants connection to the phantom murder, which is evidence of States pre-disposition to suspect appellant.

The Appeal Court states "In Hooper, the court recognized the trier of fact is not permitted to find guilt based on mere speculation or factually unsupported inferences or presumptions. See <u>Hooper v. State</u>, 214 SW3d 9, 15 (Tex. Crim. App. 2007). The <u>Hooper</u> court stated:

To correctly apply the <u>Jackson</u> standard, it is vital that courts of appeals understand the difference between a reasonable inference supported by the evidence at trial, speculation, and a presumption. A presumption is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. See Tex. Penal Code § 2.05.... In contrast, an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

*Id.* at 16. (footnote omitted). The trier of fact is permitted ' "to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation." ' *Id.* The Court of Appeals has allowed the trier of fact to do just that, draw conclusions based on speculation. An unidentified man was placed at the scene by the witness Caroline Anaya (See Reporter's Record Vol. 16 of 19 pgs. 99-100). The Court of Appeals did not take this into consideration, nor did the trier of fact when allowed to convict appellant as principle actor. There was evidence that someone else could have been there that night. In accordance with the reasoning in Hooper, Winfrey, and Gross, id., the trial courts finding that appellant caused fatal injuries to Wiebke is therefore not a reasonable inference, it is an impermissible speculation. With no evidence tying appellant to the crime "the trier of fact is not permitted to find guilt based on mere speculation or factually unsupported inferences or presumptions." Hooper. id.

The trial provides evidence of the States pre-disposition to suspect appellant and thus avoid important investigatory processes and techniques. The lack of tests shows, in the negative, that the State avoided important evidence so as to ~~avoid~~ prevent exculpating appellant. Arson Police investigator Anita Degadillo testified no tests were done on appellants' person. (Reporter's Record, Vol. 16 of 19 pgs. 141-143) She stated when asked about exculpatory tests being done, "There's several investigators that were working as a team on that day. Each one was assigned a different task. My task was to find the cause and origin of the fire. Another individual was tasked to deal with Mr. Morgan." (141/10-16) id. This lack of testing allowed the investigators to present evidence which could be infered in favor of the verdict.

The appellant ~~completely~~ completely cooperated with every investigator. Throughout the trial the evidence shows where appellant did every thing requested

-7-

of him (See Vol. 16 21/15-18, 27/1-32/29 34/8-11, 130/12-132/2, 143/25-144/14, 162/10-14, Vol. 17 11/19-12/3, 15/19-25, 18/9-22/13, 32/12-14). At no time did appellant refuse requests by investigators for statements, polygraphs, or mental health evaluations. Appellant went to the Houston Fire Department - Arson Police Headquarters and requested a polygraph. He went to the Houston Police Department - Homicide and requested a polygraph, and he went to the Harris County Sheriff's - Internal Affairs Office and filed a statement in order to take a polygraph. He was refused by all! Appellant did everything possible as an indigent person to provide exculpatory evidence.

The trial court was allowed to convict appellant based on evidence that was "pure speculation."

## PRAYER

Petitioner prays the Honorable Court of Criminal Appeals of Texas would consider the merits of petitioners claim and overturn and remand back to trial court.

RESPECTFULLY SUBMITTED

BRANDON RAY MORGAN

TDCJ-ID# 1944157

810 FM 2821

HUNTSVILLE, TEXAS

77349

-14-

# CERTIFICATE OF SERVICE

I, Brandon Ray Morgan, petitioner, do hereby certify that a true and correct copy of the foregoing, pro se petition for discretionary review NO. PD-1415-15 has been placed in the prison mailing system at the Wynne Unit, 810 FM 2821, Huntsville, Texas 77349 on this the 30 day of November, 2015 addressed to The Court of Criminal Appeals of Texas, P.O. Box 12308, Capitol Station, Austin, Texas 78711

Respectfully Submitted

Brandon Ray Morgan
Brandon Ray Morgan
No. 1944157
Wynne Unit
810 FM 2821
Huntsville, Texas 77349

**Affirmed and Memorandum Opinion filed August 27, 2015.**



In The

# 𝔉ourteenth 𝔠ourt of 𝔄ppeals

---

## NO. 14-14-00607-CR

---

### BRANDON RAY MORGAN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 338th District Court
Harris County, Texas
Trial Court Cause No. 1419351**

---

## M E M O R A N D U M   O P I N I O N

The trial court found appellant Brandon Ray Morgan guilty of murder and sentenced him to confinement for life. In a single issue, appellant claims the evidence is legally insufficient to support his conviction. We affirm.

## BACKGROUND

At about 1:00 a.m. on May 3, 2012, Clennis Tyer, District Chief of the Houston Fire Department, received a call for a house fire. When he arrived at the scene, fire was coming from every opening and the roof of the one-story residence. The complainant's body was recovered and later identified as Jeannie Waynette Wiebke, the owner of the house.

Appellant was in a relationship with Wiebke's former daughter-in-law, Bonnie Sue Cox. Cox testified that appellant was staying with Wiebke that night because Wiebke had come home from the hospital the day before. Cox was unable to stay with Wiebke because Cox's daughter was scheduled for surgery the next morning.

An investigation revealed that Wiebke was killed before the fire began. Appellant was charged with murder. Appellant waived his right to a jury. The trial court convicted him. From that conviction, he brings this appeal challenging the sufficiency of the evidence to support his conviction.

## TESTIMONY OF THE COMPLAINANT'S NEIGHBORS

Several of Wiebke's neighbors testified as to the events that night. Raul Flores, Jr., was awakened when he felt his house shake and heard a big boom. He drove to the fire and saw the house engulfed in flames. When Flores first saw appellant, he was coming from in-between the burning house and the neighbor's house. Appellant was not wearing a shirt, just shorts, and walking around. Flores did not see any burns on appellant but heard another neighbor, Joseph Mikulski, tell one of the paramedics that appellant had scratches on his back. Flores was standing with other neighbors when appellant approached and asked if they thought "they could prove it was a suicide." Appellant told Flores, "it might have

been hard for this lady because she had — he may have assumed that she had a lot of money at one time and then she didn't have any money, that she might have been going through some financial hardships." Appellant said he was asleep and was awakened by the smoke. Flores thought that was unusual because he was awakened by the blast. Flores described appellant's demeanor as confused, maybe nervous, but not emotional or hysterical. According to Flores, appellant initially said that he did not know if anyone was left in the house but then said Wiebke was inside the home. Appellant did not express any urgency about getting her out of the house.

Joseph Mikulski, who lives behind Wiebke's house, was in bed and heard an explosion that rattled his house. He saw fire coming from Wiebke's house and drove there. Mikulski noticed appellant coming from the left-hand side of the house. He asked appellant if he was all right and if anyone else was in the house. The fire department had not yet arrived. Appellant was wearing shorts and shoes but no shirt. Appellant said he was all right but was not sure if anyone else was in the house. Appellant walked over to the right side of the house, grabbed a water hose and started to squirt water on the house. Mikulski observed scratches on appellant's back right shoulder.

Mikulski also testified that appellant asked if "we thought they could prove it was suicide." Mikulski thought it was an eerie question because that would be the last thing on his mind. Appellant said he did not know "if the old woman got out." Mikulski did not notice any soot marks on appellant and he also described appellant as nervous, not emotional or hysterical. Mikulski shared his suspicions with law enforcement later that day.

A day or two before the fire, Flores and Mikulski were in a driveway across the street when appellant walked across and asked if they had seen people in

3

Ghillie[1] suits in the trees. Appellant said there were people in the trees by his house spying on him and trying to get him.[2]

Rebecca Ross lives two houses down from Wiebke's house. She did not know Wiebke but knew Cox and appellant. The evening of the fire, somewhere between 9:00 p.m. and 9:30 p.m., Cox called Ross and asked her to let Wiebke know that her phone had been left off the hook. Cox had never asked Ross to check on Wiebke at the house before that night. Ross went to Wiebke's house and knocked on the door but no one answered. The house looked dark from the front. Ross did not hear any noise and saw no lights.

Around 1:00 a.m., Ross was sleeping when she was startled by something. She went to her front window, looked out and could see the glow of the fire. Ross dialed 9-1-1 and ran outside. Ross heard a lady screaming and saw appellant standing in the front yard. She could see the house was on fire. Ross went over to where appellant was sitting in the neighbor's yard to see if he was all right. Appellant said, "I'm going to jail." When Ross replied it was an accident, appellant said, "I know what my luck is like." Ross smelled alcohol on his breath and thought appellant was drunk. Ross told appellant that they were home if he needed anything. Appellant said she was pretty and smiled at her. When Ross said again that she was going inside, appellant repeated the comment that she was pretty. Appellant's comments made her uncomfortable, and Ross went inside her house.

Ross tried to call Cox but failed to reach her and left a voice mail. Between 5:00 a.m. and 6:00 a.m., Ross reached Cox and told her there had been a fire. Ross told Cox that Wiebke did not make it out but appellant had. Later that day, Cox texted Ross and asked if Cox and appellant could come see her because he was

---

[1] A type of camouflage clothing designed to resemble heavy foliage.

[2] Following an evaluation, appellant was found competent to stand trial.

confused about what had happened. Ross agreed but they never showed up and Ross did not hear from Cox after that. Ross described Cox's reaction to the news that Wiebke was dead as quite calm, which was strange, but Ross thought it was shock. Ross never saw Cox cry over the news.

Heronina Cardenas lived next door to Wiebke for approximately twenty-three years. Cardenas knew Cox and knew appellant as her boyfriend. Before 1:00 a.m., Cardenas heard appellant near the garage talking loudly, making noise and thrashing around. She heard noises like "moving things and hitting things and some crackling noise." Cardenas could not hear exactly what appellant was saying, but he was excited and loud. Cardenas thought about calling the police because of the amount of noise appellant was making.

About thirty to forty minutes later, at approximately 1:00 a.m., Cardenas heard an explosion that rattled her house. Cardenas called to her sister, Erendira Rios, who was sleeping upstairs to call 9-1-1. Cardenas testified that because she heard appellant in the backyard, she "knew he had done something." She thought he blew out the air conditioner or erupted the gas line or something to that effect.

Rios testified that she was awakened by a big explosion. She got dressed, called 9-1-1 and went outside with Cardenas. They saw appellant right next to Cardenas's house. Cardenas asked, "What did you do?" Rios testified appellant was crying, saying "Fire, fire." Cardenas and Rios testified appellant asked for a water hose. Cardenas directed him to it. Appellant got the hose and went in front of Wiebke's house. Appellant was "not himself," he was "like, drugged or alcohol or something," and could not stand up. Appellant did not mention Wiebke but kept saying "Bonnie." Appellant kept standing in the front, without a shirt, sweaty and talking and making no sense. Cardenas did not see any burn marks on appellant.

Rios asked appellant the whereabouts of the lady of the house. The question startled appellant, and he seemed scared and very nervous. Answering, appellant said, "I don't know. I went from room to room and I didn't see anybody." Rios did not see any burn marks but saw marks like he had been in heavy smoke, "Kind of ashy-looking." According to Rios, appellant's skin was partially black, as if covered in soot and like he had been near a fire. He was nervous, scared and agitated. Appellant was crying when he told Rios that he went through the house and did not see anybody.

Caroline Anaya, Cardenas's daughter, knew Wiebke and Cox. Anaya went to Cardenas's house about 10:30 p.m. the night of the fire. As Anaya approached, she saw someone sitting on a chair and the porch light was off. She heard mumbling and saw someone flickering a light on and off. The voice was male and he was saying, "I'm sorry for everything I've done" in a remorseful voice. Anaya testified that it was too dark for her to see who it was but she "figured it was the guy that was with Bonnie." Anaya described him as white, bald, wearing a white shirt and jeans. Anaya left Cardenas's house around midnight.

## ARSON INVESTIGATION

Tyer testified it took approximately twenty minutes to put out the fire. Because of the magnitude of the fire, Tyer believed there was some delay before the 9-1-1 call was made.

Tyer's incident-command technician conducted a survey around the house and informed him that a man said there might be someone still in the house. The man, later identified as appellant, was an occupant of the house and had a cut on his right arm; he was "clean," not covered in soot or burned. Tyer testified it was unusual for one person in a fire to make it out when another person did not. Tyer thought it was unusual that appellant was in there and able to make it out because it

was "really a bad fire" and "there was some kind of explosion, the windows were blown out." Tyer did not see any injuries other than some cuts or scrapes to appellant's face. Tyer described appellant as a little nervous "but pretty much calm." Tyer testified that usually if one person makes it out of a fire but someone is still inside, that person is screaming, hysterical, and trying to get back in to rescue the one inside. According to Tyer, appellant did none of those things. Appellant did not provide information as to where the person was inside the house.

Robert Marley, with the Arson Bureau of the Houston Fire Department, testified that while en route he was advised there was a fatality in the house. The fire was out when Marley arrived at the scene. Tyer pointed appellant out to Marley as the man that was in the house when the fire started. Appellant had on shorts and a white T-shirt. Appellant was "pacing around a little bit" but appeared calm.

Appellant told Marley that he had been asleep. He and Wiebke had eaten dinner and she had fallen asleep on the couch. Appellant said Wiebke smoked. He awoke to thick smoke and heat. Appellant felt around on the couch but could not find Wiebke and he got out. Appellant said he was trying to call for her but the fire and smoke were too thick and he could not go back inside the house.

Marley noted that appellant was "very clean" and did not have any soot on him, which "was strange because if you were in a house that had burned that bad, you would have some type of soot." Marley testified that in his "30 years of firefighting, if you were in a house with a lot of smoke, you would have a lot of soot all over your body, on your hair, your nose, arms, face, wrinkles in your face, wrinkles in your neck. Anywhere that you sweat, you would have black soot." Marley testified appellant was "very clean" although a little sweaty. Marley thought appellant's story was inconsistent with his appearance. "It just didn't make

sense that he was as clean as he was if he was inside the house." It did not appear to Marley that appellant had been inside the house in a dead sleep. Appellant would have been much dirtier if he had been inside asleep when the fire started. Marley testified that if appellant started the fire and ran out, he would probably not have soot on himself. Marley thought appellant was suspicious because he was very calm and very clean. Marley did not think appellant was telling him the whole truth.

Marley testified the house burned awhile before the fire department was able to respond. Marley thought the fire started in the center of the house and had to have burned for a while before it began coming out of all the windows. The body was recovered in the living room area, near the center of the house. Marley thought several minutes elapsed before the emergency calls were made. He did not think appellant was one of the persons who called 9-1-1.

Marley asked appellant to give a statement, and appellant was transported to Arson Bureau headquarters. Appellant told Marley that he had taken Xanax after Wiebke fell asleep, smoked cush,[3] and drank some beer while eating dinner. Appellant had not told Marley about the drugs at the scene of the fire.

Anita Degadillo, an arson investigator with the Houston Fire Department, arrived on the scene at approximately 7:00 a.m. There was evidence of an explosion and heavy fire to the upper regions of the house and a major fire in the center of the residence. The back door that leads into the kitchen area had been opened and the locking mechanism of the doorway showed there was no forcible entry. Oxygen bottles were stored in the front room. The electrical outlets were checked to determine if there had been electrical malfunction and none was noted. A piece of an oxygen cylinder was recovered. The body was recovered near the

---

[3] Synthetic marijuana.

couch. The fire started on the south side of the couch, near the head of the body and occurred before the explosion. A cause for the fire could not be determined.

When Degadillo interviewed appellant she found his appearance suspicious because appellant stated there was already smoke and fire when he woke up but he showed no signs of soot, singeing, or burns except for a small burn on his knuckle. Degadillo testified appellant's claim that he was sitting in the chair across from the couch where the body was recovered was suspicious because he would have been injured if that were true. Degadillo did not think appellant's claim that he did not hear the explosion was possible. Degadillo admitted that she did not know the level to which appellant was intoxicated at that time. She testified that if appellant was sitting in the chair and exited the house at the time he claimed, even if he had suffered a loss of consciousness, he would have had more damage to his body from the explosion. Degadillo testified that if appellant walked right past the body he would have seen it. She later admitted it was possible that he did not see the body.

Alfredo Martinez, Chief Investigator for the Houston Fire Department Arson Division, testified a can of wasp spray was recovered on the sidewalk in front of the residence. Martinez testified the wasp spray was a potential accelerant because it was an aerosol can.

The body was found in the living room on the floor in front of the sofa. It was in an unusual position because Wiebkee was laying on her back with her legs tucked underneath and typically the victims in a fatality fire are found face-down. There was no clothing or remnants of clothing on the body. Because Wiebke's backside was up against the sofa, there was an area protected from the fire where clothing typically would have been found.

Investigators purchased the same type of cigarettes Wiebke smoked to determine whether an accidentally dropped cigarette could have ignited the fire.

Martinez explained that new cigarettes are "fire safe." Fire-safe cigarettes contain places in the cigarette that are supposed to stop the flame if it is resting on a couch or a bed and not actually being smoked.

Martinez testified the fire went from the point of origin on the other side of the couch, traveled across the couch and to the oxygen canister, which exploded. The cause of the fire was undetermined because the Bureau could not absolutely rule out the possibility that the fire was caused by a dropped cigarette. If the Bureau could have ruled out that cause, the determination would have been an incendiary fire.

Robert Carnes, a senior investigator with the City of Houston Fire Department, testified he met with appellant between 3:00 a.m. and 4:00 a.m. Appellant's clothing was fairly clean and Carnes testified that one who had been in a fire would look a lot different. Appellant had a faint smell of smoke which one could get just by standing on the street. Carnes did not find appellant's claim of being in the fire consistent with his appearance and smell. The smell of smoke on appellant was faint and appellant's face and hands were clean. Carnes testified that one waking up in dark, black smoke would have soot on his face, coming out his nose, and a strong smell of smoke in his clothing. The smell would last until after the person showered.

Appellant told Carnes that he was asleep on the sofa and when he woke up there was heavy black smoke in the living room and he had to run out of the fire. According to Carnes, appellant would have passed the body within a couple of feet when exiting the house and visibility would have been clearer on the floor.

The canister of oxygen that exploded was about eight feet from the chair. Carnes testified that if appellant was in that chair he would expect appellant to be at the hospital from the force of the canister exploding. The explosion pushed all

10

the furniture at least a foot away from the canister.

During a walk-through interview at the scene of the fire the following morning, conducted by Hernandez and Degadillo, appellant said that Wiebke was just waking up when Cox dropped appellant off at the house. Appellant and Wiebke talked about the apartment complex and then Wiebke laid down to rest. Appellant said Wiebke leaned over and put her head on the sofa with her legs on the floor. When appellant woke up, there was smoke everywhere and he could not see Wiebke. He saw nothing but gray and did not see the fire but could feel it. The last thing he remembered was relaxing in the recliner, but he did not remember where he was sitting. Appellant ran outside to catch his breath and was going to go back inside, but the flames were too intense. He could not recall whether he exited the house out the front door or the back. He was calling for Wiebke but did not hear her. Appellant said he had a big knot on the back of his head "that came from something." The shirt he had on was not his and a neighbor must have given it to him. Appellant thought there were already firemen and neighbors outside when he went out. He said he told everyone that Wiebke was still inside the burning house. Appellant did not hear an explosion, but a neighbor told him it woke her up. Appellant said, "maybe that's what woke me up." Appellant asked, "if the tank would have blown up, wouldn't it have got me too." Appellant said his only injuries were a burn on his knuckle and the knot on the back of his head. The scratches on his body were from climbing trees two days earlier.

## CAUSE OF DEATH

Dr. Dwayne A. Wolf, Deputy Chief Medical Examiner for Harris County, testified that Wiebke had injuries best explained by a compression-type force to the neck, a blow to the face, and a blow to the back. There was hemorrhaging in the deep soft tissues underneath the left side of the jaw, indicating either blunt trauma

11

or compression. There was hemorrhaging on both sides of the neck, more on the left than the right, and a fracture of laryngeal cartilage on the right side. These injuries were consistent with being grabbed by the throat or a compression-type injury. On the right side of the face was a fracture extending from the jaw up into the eye orbit and across the floor of the orbit. There was hemorrhaging in the orbital soft tissue. There was subdural hemorrhaging, particularly over the inferior part of the frontal lobes. The hemorrhaging and fractures were consistent with a blow to the face. There were multiple fractures to Wiebke's ribs. The fractures occurred at or near the time of death.

There was no soot residue in Wiebke's airways, an indication that death occurred before the fire. The level of carbon monoxide in her blood also indicated that Wiebke was dead before the fire. Dr. Wolf testified the cause of death was blunt force trauma with neck compression and the manner of death was homicide.

Dr. Jennifer Love of the Harris County Institute of Forensic Sciences also testified regarding Wiebke's injuries. There was a fracture indicating a "force squeezing of the neck," and she found rib fractures indicative of significant blunt force trauma to the back.

### HOMICIDE INVESTIGATION

Officer Mark Coleman with the Houston Police Department Homicide Division testified that appellant's actions were suspicious from the start. According to Coleman, other investigators had relayed information from witnesses about inconsistencies with appellant's statements.

The investigation turned into a homicide investigation when the police were informed by Dr. Wolf that he was prepared to rule the complainant's death a homicide. Dr. Wolf informed Coleman that Wiebke's death was not caused by the

fire or the explosion. No prior injuries or pre-existing conditions explained the injuries seen at the time of Wiebke's autopsy.

Coleman conducted a video-taped interview of appellant in July 2012, after appellant voluntarily came to the police station to give a statement. Appellant said that he wanted to talk with Coleman because he had done some of his own investigating and wanted to discuss what he had discovered.

Appellant said he and Cox had been dating and living together for the past two years. Appellant described his relationship with Cox as a common-law marriage. Wiebke had purchased an apartment complex in Galveston with money she inherited, and appellant and Cox had moved into one of the apartments. According to appellant, he and Cox had been using their own money on improvements. The apartment complex was eventually foreclosed, and appellant and Wiebke lost their investment. This event, among other things, created a rift between appellant and Wiebke.

At the time of the interview, appellant was not working but said he had been employed when they moved into the apartment complex. According to appellant, he lost a substantial amount of money on the investment and Wiebke had no intention of paying him back. Appellant relied on Wiebke for his living arrangements and expenses and, according to appellant, Cox also was relying on Wiebke for day-to-day support.

Appellant told Coleman that on the night of the fire he had taken the drug Xanax, smoked "cush" and had a few beers. Appellant used cush on a regular basis. Coleman testified that the substance has been known to cause hallucinations.

Appellant admitted that he was the only person in the house with Wiebke the night of the fire. Appellant told Coleman that he never heard anyone knock at the door and said he would have heard a knock.

Coleman asked appellant about being on the front porch and flicking a lighter. Appellant said that he does not play with a lighter and was not doing so on the front porch that night. Appellant said he would not light a fire. Coleman testified that appellant stated he likes to handle his problems with his fists because that was more personal. Coleman told appellant that Wiebke died before the fire and questioned appellant about how the body was found and the lack of clothing. Appellant eventually asked if Wiebke was killed with someone's fists or was hit with something. Coleman told him that Wiebke was killed with fists. During the interview, appellant consistently maintained that he was not involved either in the death of Wiebke or in the fire.

Coleman learned of a Children's Protective Services (CPS) investigation involving appellant. He contacted CPS and obtained a record of the investigation. CPS had received allegations of sexual abuse from one of Cox's daughters and had opened an investigation; the allegations were eventually cleared as unfounded. Coleman did not find any investigations other than the CPS investigation. Appellant believed Wiebke had put her granddaughter up to making the allegation of sexual abuse so that Cox would return to her son.

Coleman admitted that Cox's behavior was also suspicious but there was no evidence against her. Cox told Coleman that she did not remember calling Becky Ross. Coleman testified that there was no indication that Cox was at the house the night of the fire.

Cox testified that on the night of the fire, she and her daughters ate dinner with Wiebke. She picked appellant up and brought him to Wiebke's house. Cox

14

said they ate breakfast, lunch, and dinner at Wiebke's house on a daily basis and Wiebke would pay for the meals. Cox agreed that she was financially dependent on Wiebke and said appellant was financially dependent "to a point." Cox later denied being dependent on Wiebke and testified the extra money was "nice" but she did not have to have it. Wiebke paid appellant to do things around the house for her, but Cox said he was not dependent on that money. Cox described appellant as her boyfriend, not her husband.

Cox testified that she called Ross because she could not get through to appellant on his cell phone or to Wiebke on the house phone or her cell phone. Cox believed she received a call about the fire at 1:11 a.m. She did not arrive at the scene until 7:00 a.m. Cox's explanation was, "Why should I go there? There was a fire." Cox said she did not know at that time Wiebke was dead.

Cox testified that when she saw appellant at the house that morning, his clothes were a little dirty, but he was not covered in soot. According to her, it did not look like he had been in a house fire.

Cox testified that she had access to Wiebke's checkbook and wrote checks to herself with Wiebke's permission. According to Cox, Wiebke always signed her name. Cox admitted that she was once suspected of forging checks and her ex-husband accused her of stealing from Wiebke. Cox also admitted that she had personal knowledge that there were checks that been forged with Wiebke's signature but denied that she had done it.

Cox testified that she had heard appellant talk about people in Ghillie suits in the trees. She said he "talked some crazy stuff." Cox denied starting the fire.

The trial court admitted into evidence a letter dated July 19, 2012, from appellant to Cox. The letter contained the following statement:

15

I Brandon Ray Morgan accept full responsibility for all crimes Bonnie Sue Cox is and will be accused of. I held her hostage and forced her to do everything you [. . .]want to say she did.

## STANDARD OF REVIEW

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under the single legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Matlock v. State*, 392 S.W.3d 662, 673 (Tex. Crim. App. 2013).

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational factfinder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *see also Jackson*, 443 U.S. at 319. The trier of fact is the exclusive judge of the credibility of witnesses and the weight to be given to the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We defer to the factfinder's responsibility to fairly resolve or reconcile conflicts in the evidence. *Id.* We draw all reasonable inferences from the evidence in favor of the verdict. *Id.*

## ANALYSIS

Appellant challenges his conviction on the basis that it amounts to "pure speculation." Appellant cites *Hooper v. State,* 214 S.W.3d 9, 15 (Tex. Crim. App. 2007), *Winfrey v. State,* 323 S.W.3d 875, 882 (Tex. Crim. App. 2010), and *Gross v. State,* 380 S.W.3d 181, 188 (Tex. Crim. App. 2012), in support of his argument the evidence is legally insufficient to support his conviction.

The *Winfrey* court held that if the evidence at trial raises only a suspicion of guilt, even a strong one, the evidence is insufficient. *Winfrey*, 232 S.W.3d at 882. *Winfrey* is distinguishable from the case at bar because in that case there was no evidence placing the defendant at the murder scene. By contrast, appellant, by his own admission, was inside the house at the murder scene.

The defendant in *Gross* was convicted under the law of parties, and the evidence established another person was the shooter. The court concluded the conviction "was based on pure speculation" because there was no evidence of a prior or contemporaneous plan between the defendant and the shooter to commit the murder. In the case at bar, appellant was convicted as the principal actor. Because there is evidence appellant was the only person present in the house when Wiebke suffered her fatal injuries, the factfinder's conclusion that appellant caused those injuries is hardly "pure" speculation.

In *Hooper*, the court recognized the trier of fact is not permitted to find guilt based on mere speculation or factually unsupported inferences or presumptions. *See Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). The *Hooper* court stated:

> To correctly apply the *Jackson* standard, it is vital that courts of appeals understand the difference between a reasonable inference supported by the evidence at trial, speculation, and a presumption. A presumption is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. See Tex. Penal Code § 2.05. . . . In contrast, an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

17

*Id.* at 16 (footnote omitted). The trier of fact is permitted "to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation." *Id.* The *Hooper* court provided a hypothetical to illustrate this point that is analogous to the case at bar.

> A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking). Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation. But, what if there is also evidence that the other guns in the room are toy guns and cannot shoot bullets? Then, it would be reasonable to infer that no one with a toy gun was the shooter. It would also be reasonable to infer that the woman holding the smoking gun was the shooter. This would require multiple inferences based upon the same set of facts, but they are reasonable inferences when looking at the evidence. We first have to infer that she shot the gun. This is a reasonable inference because she is holding the gun, and it is still smoking. Next, we have to infer that she shot the person on the floor. This inference is based in part on the original inference that she shot the gun, but is also a reasonable inference drawn from the circumstances.

*Id.* at 16.

By his own admission in his interview with Coleman, appellant was the only person in the house with Wiebke after Cox left; and according to appellant, Wiebke was alive at that time. There is no evidence that anyone else was in the house that night. In accordance with the reasoning in *Hooper,* the trial court's

finding that appellant caused the fatal injuries to Wiebke is therefore a reasonable inference, not an impermissible speculation.

Moreover, other evidence gives rise to reasonable inferences in favor of the verdict. A number of witnesses testified that appellant's appearance belied his claim that when he awakened, the house already was full of smoke. Leaving aside the clean shirt, which the evidence indicates was given to appellant sometime after he exited the house, the record contains testimony that appellant had no soot on his face, around his nose, or his neck. There is no evidence that appellant washed after exiting the house. Rios provided contrary evidence, testifying that appellant's skin appeared covered in soot. It was within the trial court's purview to resolve or reconcile this conflicting evidence. *See Isassi*, 330 S.W.3d at 638.

Two of the arson investigators testified there was a delay from the start of the fire until the placement of the 9-1-1 call. Specifically, the record reflects neighbors did not call 9-1-1 until after the explosion, which the evidence showed occurred after the fire started. There is no evidence that appellant called 9-1-1. Appellant's claim that he was asleep until the fire was well under way would explain his failure to call. Even so, as the exclusive judge of the credibility of witnesses and the weight to be given to the evidence, the trial court was not required to accept appellant's version of events in light of the testimony that appellant did not appear to have been in the house when it filled with smoke. *See id.*

Two of the investigators testified that had appellant been sitting in the recliner when the oxygen canister exploded, he would have been injured. Under appellant's version of events, he could have fled the house after the fire started but before the canister exploded, thus explaining his lack of injury. But, appellant said he did not hear the canister explode, even though it was loud enough to wake the

neighbors and rattle the house next door. It was for the trial court, as the trier of fact, to determine the credibility of witnesses and the weight to be given the evidence and to resolve any conflicts in the evidence. *See id.*

We do not disagree with appellant's argument that Cox's behavior was suspicious. Yet, any evidence that Cox also may have been involved does not necessarily exculpate appellant.

## CONCLUSION

Viewing all of the evidence in the light most favorable to the verdict, we conclude that a rational trier of could have found the elements of the offense beyond a reasonable doubt. Accordingly, we overrule appellant's sole issue and affirm the trial court's judgment.

/s/    Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Jamison and Yates.[4]
Do Not Publish — Tex. R. App. P. 47.2(b).

---

[4] Senior Justice Leslie Brock Yates sitting by assignment.

Brandon Morgan 1944157
Wynne Unit A4-4-213
810 FM 2821
Huntsville, Texas 77349

Legal Mail

Mailed on
Nov. 30, 20

Court of Crim
PO Box 12308
Austin, Texas