**AFFIRM; and Opinion Filed August 9, 2023**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

**No. 05-22-00637-CR**

**RICHARD RAY PENCE, II, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 072811**

## MEMORANDUM OPINION

Before Justices Molberg, Carlyle, and Smith
Opinion by Justice Smith

Appellant Richard Ray Pence, II appeals his conviction for the murder of his wife Pamela Pence. In a single issue, appellant contends that the evidence is insufficient to support his conviction and, specifically, to prove that he (1) intentionally or knowingly caused Pamela's death, (2) intended to cause serious bodily injury, or (3) committed an act clearly dangerous to human life. We affirm the trial court's judgment.

## Background

Appellant was charged by indictment with Pamela's murder in alternative paragraphs. The paragraphs, which tracked Texas Penal Code section 19.02, alleged that appellant did:

(1)    intentionally and knowingly cause the death of . . . Pamela . . . by hitting or striking her body, head, or face with his hand, foot, or other object unknown to the Grand Jury;

(2)    with intent to cause serious bodily injury to . . . Pamela . . ., commit an act clearly dangerous to human life that caused the death of [Pamela] by hitting or striking her body, head, or face with his hand, foot or other object unknown to the Grand Jury; or

(3)    commit or attempt to commit an act clearly dangerous to human life, namely hitting or striking Pamela . . . in her body, head, or face with his hand, foot, or other object unknown to the Grand Jury, that caused the death of Pamela . . ., and [appellant] was then and there in the course of committing a felony, namely Assault Causing Bodily Injury Family Violence with Previous Conviction, and the death of [Pamela] was caused while [appellant] was in the course of and in furtherance of the commission or attempt of the felony.

Appellant pleaded not guilty, and the case was tried to a jury.

The evidence at trial showed that the Pences lived in Southmayd, Grayson County. Between 7:00 a.m. and 8:00 a.m. the morning of September 26, 2020, a neighbor, Jose Venegas, observed the Pences arguing. Venegas saw Pamela walk back into her house carefully, like something hurt. Venegas then heard "banging the walls and all." At approximately 8:30 a.m., another neighbor, Arthur Newton, heard a woman's voice, which he thought came from the Pences' house, saying "No. No.

–2–

No. Don't. Stop." Both Venegas and Newton had overheard "a lot" of arguments at the Pences' house. This argument was different, according to Newton, because it appeared to be "short and done."

Around 10:00 or 11:00 a.m., Ricky Pence, III, the Pences' adult son, arrived to help appellant move some "stuff." Appellant met him at the back door, and they talked outside for a couple of hours. Appellant stopped Ricky from entering the house and seemed "kind of off." Appellant subsequently entered the house and, when he returned, told Ricky he thought Pamela was dead.

Ricky entered the house and found Pamela lying on the kitchen floor. Appellant told Ricky that he did not want to go back to jail and asked Ricky to kill him. He also tried, unsuccessfully, to prevent Ricky from calling 9-1-1. Appellant could be heard apologizing to Ricky in the background of the 9-1-1 recording. Appellant then left in his truck.

Grayson County Trooper Michael Landeros, the first peace officer at the scene, testified that the house was disheveled and Pamela had been "brutally assaulted." Pottsboro Police Officer Steve Northington, the second to arrive, testified that Pamela's face was "pretty distorted" and it appeared that there was "some kind of homicidal-type violence."

Pottsboro Police Officer Travis Looney initiated the investigation at the Pences' house and observed holes in walls, busted sheetrock on the floor, and damage to the underside of a bar top like someone had kicked it. There were bloody

–3–

napkins everywhere, blood splatter on lower cabinets, and blood droplets on the floor. Pamela's face was unrecognizable; she was heavily swollen and looked as if she had been hit by a car or a train. Brad Oliver, a Ranger with the Texas Department of Public Safety, took over the investigation. Based on his observation of Pamela's injuries, he believed that she "died a horrible death from blunt force trauma, . . . multiple blunt force trauma injuries to her body, from her head to her toes."

Peace officers located appellant driving north on U.S. Highway 75 and pulled him over. During transport to the police station, appellant stated, "it's not supposed to happen; it wasn't intentional."

Prior to his arrest, appellant phoned both a co-worker, Michael Spearman, and his employer, Dwayne Hicks. Appellant told Spearman, "[I]t's bad" and that he was "going to prison." Appellant explained that he had gotten into a fight with Pamela, it got physical, and Pamela was dead. Appellant told Hicks that he would not be at work on Monday and that "she's dead," she would not "shut up," he choked her, and he "didn't mean to do it." Appellant also called Ricky while Ricky was speaking with Trooper Landeros; Landeros overheard appellant apologize.

Dr. Stephen Lenfest, a Dallas County medical examiner, performed an autopsy on Pamela. The autopsy revealed a number of injuries consistent with recent blunt force impacts. Those injuries included bruises scattered over the left side of Pamela's head, all over the right side of her head, on her right eye and cheek, and on her left ear. The right side of her face was swollen. Her scalp was detached from

her skull. There were contusions to her brain and swelling and bleeding in the soft tissue of both sides of the brain. There were abrasions on Pamela's forehead and the left side of her face and head. There were lacerations to her nose, upper lip, the inside of her lips, and on her gums. Her tongue was bruised, consistent with being struck in the face or biting the tongue. According to Dr. Lenfest, there were multiple impact points on Pamela's head.

Pamela's wrists, left hand, arms, thighs, and lower legs were bruised. There were abrasions to her knees and bruising and swelling on her right ankle and foot. Her right shoulder was dislocated. There were contusions to both collar bones and her left lung. Her spleen was lacerated; the impact had been hard enough to break tissue inside the spleen while the spleen remained intact. She suffered fractures to the right second and sixth through eighth ribs and left sixth through tenth ribs. Her eighth and ninth left ribs punctured her chest cavity. Dr. Lenfest testified that the cumulation of all of the blunt force injuries to Pamela caused her death.

Dr. Lenfest testified that Pamela was approximately five feet tall and weighed ninety-one pounds. Appellant weighed 250 pounds and stood five feet, ten inches tall when he was booked into jail.

Ricky testified that his parents frequently argued, both verbally and physically, for as long as he could remember. Both appellant and Pamela instigated arguments, and alcohol was typically involved. Only appellant, however, was physical, and Ricky had observed appellant strike, push, and kick Pamela.

Pamela's niece, Jennifer Hulette, testified to a 2006 incident when appellant elbowed Pamela in the stomach and knocked her into some bushes. Another time, Pamela arrived at Jennifer's house in a wrist brace and asked if she could stay. Police officer Jason Lurkins and Detective Troy Short testified that they had investigated appellant for domestic violence in 2003 and 2006, respectively. As a result of those investigations, appellant was convicted of several offenses.

After hearing the evidence, the jury found appellant guilty of murder and assessed punishment at confinement for life. The trial court entered a judgment of conviction on the jury's verdict. Appellant filed a motion for new trial, which the trial court denied, and this appeal followed.

## Sufficiency of the Evidence

When reviewing the sufficiency of the evidence to support a conviction, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden

of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

When conducting a legal sufficiency review, we consider all evidence in the record regardless of whether it was properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319; *see also Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Isassi*, 330 S.W.3d at 638. The factfinder may choose to believe or disbelieve any part of any witness's testimony. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Clayton*, 235 S.W.3d at 778.

A criminal conviction may be supported by both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

A person commits murder if he:

(1)     intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b). "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003); *see also Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) (citing *Lugo-Lugo v. State*, 650 S.W.2d 72, 82 (Tex. Crim. App. 1983) (op. on reh'g) (noting the statute "focuses the mental state of the individual on the particular result and not on the conduct that causes death")).

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). The test for determining whether an act is clearly dangerous to human life is an objective one. *Lugo-Lugo*, 650 S.W.2d at 81 (the act intending to cause serious bodily injury must be "objectively clearly dangerous to human life").

"Intent and knowledge are fact questions for the jury and are almost always proven through evidence of the circumstances surrounding the crime." *Manrique v.*

–8–

*State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring). A jury may infer a defendant's intent by his acts, words, and conduct, as well as the method he used to commit the crime, the nature of the wounds inflicted on the victim, and the relative size and strength of the parties. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (citing *Manrique*, 994 S.W.2d at 649); *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

Appellant asserts the evidence is insufficient to support his conviction because the record is "void" of evidence that he intentionally or knowingly caused Pamela's death, intended to cause serious bodily injury, or committed or attempted to commit an act clearly dangerous to human life. We disagree.

Appellant does not dispute that he caused Pamela's death. There was evidence indicating that appellant was angry with Pamela because, in his words, she would not "shut up." The jury reasonably could infer that his anger was a motive for attacking Pamela and a circumstance indicating his guilt and culpable mental state. *See Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020) (citing *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)).

The evidence also shows that appellant "brutally assaulted" Pamela. There was a significant physical disparity between the two, and Dr. Lenfest testified that Pamela's injuries were not the kind of injuries seen in persons capable of defending themselves. Dr. Lenfest concluded that the extensive injuries to Pamela's head alone were the result of "many different impacts" and it would have taken a "significant

–9–

amount of force" to cause her injuries, particularly the separation of her scalp from her skull and the fractures to her ribs. The jury could infer the extremely violent nature of appellant's behavior from the testimony about, and photographs showing, Pamela's injuries, the extent of blood throughout the kitchen, and the damage to the Pences' house. Given the manner in which appellant committed the offense and the injuries he inflicted on a much smaller and weaker victim, a rational jury could have found beyond a reasonable doubt that appellant attacked Pamela with intent to cause her death, knew that such an attack could kill her, or, with intent to cause Pamela serious bodily injury, committed an act clearly dangerous to human life that created a substantial risk of death. *See Patrick*, 906 S.W.2d at 487; *e.g.*, *Tretter v. State*, No. 03-12-00034-CR, 2014 WL 3893016, at *4 (Tex. App.—Austin Aug. 7, 2014, pet. dism'd) (mem. op., not designated for publication) (jury could infer that defendant intentionally or knowingly caused his wife's death and intentionally caused her serious bodily injury from the severity of her head trauma and other blunt force injuries, which were consistent with multiple impacts and resulted from significant and severe force, and from the size and strength differential between defendant and his wife).

Appellant's subsequent conduct also supports the jury's verdict. He initially prevented Ricky from entering the house, waited hours before telling Ricky of Pamela's death, and then fled. *See Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (defendant's flight from the scene, among other facts, supported

jury's finding of intent to kill). Indeed, the evidence shows that appellant's priority was to avoid returning to jail.

To support his argument that the evidence is insufficient, appellant points to his expressions of remorse and statements indicating that he did not mean for Pamela to die. The jury, however, in fulfilling its duty to resolve conflicting inferences in the evidence, could have determined that appellant's subsequent expressions of remorse did not negate or rebut his intent to cause Pamela's death or serious bodily injury or his knowledge that his conduct was reasonably certain to cause her death. *See, e.g.*, *Gipson v. State*, No. 09-19-00275-CR, 2021 WL 3743838, at \*3 (Tex. App.—Beaumont Aug. 25, 2021, pet. ref'd) (mem. op., not designated for publication) (jury could have decided that defendant's remorse after stabbing victim did not show he did not act intentionally or knowingly when the stabbing occurred). Likewise, the jury was free to distrust appellant's self-serving statements that he "didn't mean to do it" and it "wasn't intentional" in light of the evidence indicating otherwise. *See, e.g.*, *Jones v. State*, No. 01-01-01233-CR, 2003 WL 21513051, at \*7 (Tex. App.—Houston [1st Dist.] July 3, 2003, pet. ref'd) (mem. op., not designated for publication) (jury was free to disbelieve appellant's statement that he did not intend to kill victim).

Viewing all of the evidence in the light most favorable to the verdict, we conclude that the jury rationally could have found that appellant caused Pamela's death with the requisite culpable mental state under penal code section 19.02(b)(1),

–11–

(2), or (3). We further conclude that the jury reasonably could have drawn the inferences necessary to establish that appellant's conduct created a substantial risk of death and, therefore, he committed an act clearly dangerous to human life. Accordingly, we overrule appellant's sole issue.

## Conclusion

The trial court's judgment is affirmed.

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
220637F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RICHARD RAY PENCE II,
Appellant

No. 05-22-00637-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 397th Judicial
District Court, Grayson County,
Texas
Trial Court Cause No. 072811.
Opinion delivered by Justice Smith.
Justices Molberg and Carlyle
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered this 9th day of August, 2023.